**UNITED STATES of America,
Plaintiff–Appellee,**

v.

**Paul L. GLOVER, Defendant–Appellant.**

No. 95–3346.

United States Court of Appeals,
Seventh Circuit.

Argued Sept. 13, 1996.

Decided Dec. 2, 1996.

Barry Rand Elden, Chief of Appeals, Stephen Anderson (argued), Office of the United States Attorney, Criminal Appellate Division, Chicago, IL, for Plaintiff-Appellee.

Thomas M. Breen, George J. Murtaugh (argued), Martin, Breen & Merrick, Chicago, IL, for Defendant-Appellant.

Before CUDAHY, KANNE and ROVNER, Circuit Judges.

ILANA DIAMOND ROVNER, Circuit Judge.

At the close of his second jury trial, Paul L. Glover, formerly the Vice–President and General Counsel of the Chicago Truck Drivers, Helpers and Warehouse Workers Union (Independent) (CTDU or the Union), was convicted of numerous federal offenses arising from a series of investments that he arranged to be made with money from the Union's pension and health and welfare funds. Glover entered into these transactions on the Union's behalf for the purpose of obtaining kickbacks for himself and others. He was sentenced to one term of 84 months in prison and two terms of 36 months in prison for his role in these schemes, the terms set to run concurrently and to be followed by three years of supervised release. In addition, Glover was required to forfeit $325,000 to the United States and to pay the costs of his prosecution. Glover's first trial, at which he testified in his own defense, resulted in a mistrial due to the jury's inability to reach a verdict. Although Glover then chose not to take the stand at his second trial, the district court permitted the government to introduce a select portion of the transcript of Glover's testimony from his first trial, rejecting Glover's request that essentially all of his prior testimony be admitted in order to clarify the portion that was presented to the jury. Fed.R.Evid. 106. In this appeal, Glover contends that the district judge abused his discretion in doing so, and that the judge's ruling deprived him of his right to a fair trial. Glover also assails the district judge's decision to increase his base offense level under the Sentencing Guidelines by two levels for obstruction of justice, U.S.S.G. § 3C1.1, on the ground that his testimony at his first trial was perjurious. We affirm.

## I. BACKGROUND

The CTDU is a national labor union with over 5,000 members, most of whom are truck drivers, dock workers and warehouse workers residing in the Chicago area. John R. Johnson, Sr., served as its President, and Glover as its Vice–President and General Counsel during all times relevant to this case. Glover was Fund Manager of the Union's Health and Welfare Fund, as well as a member of its Board of Trustees, and was responsible for managing the Fund's day-to-day operations. Glover was not, however, authorized to make investment decisions concerning the Health and Welfare Fund's assets on his own, as such decisions were to be made only under the direction of its full Board of Trustees. The CTDU Pension Fund was also administered by a Board of Trustees, which retained two money managers to provide it with investment advice. Pension Fund investments could only be authorized by a majority vote of its Board. Johnson held the position of Fund Manager of the Pension Fund and served with Glover as one of its trustees. The American National Bank of Chicago, Illinois, was one of the two money managers of the Pension Fund entrusted with reviewing its investments.

Between October 1986 and July 1987, Wolf, Webb, Burke & Campbell (Wolf, Webb) of Philadelphia, Pennsylvania, served as the Fund's second money manager, but later resigned and was replaced in August of 1987 by M.D. Sass of New York City.

During the latter part of 1986 and early 1987, Johnson met several times with John Lelis, a commercial mortgage broker who suggested that the Union invest its funds in Coalstar Enterprises, a coal mining project in northern Indiana. Lelis sought to obtain two million dollars in investments for the project, and was willing to offer a kickback of a portion of his commission if Johnson could arrange to invest the sum. Johnson then met with Glover and told him about the arrangement, and Glover proposed that they obtain the money by convincing the Pension Fund money managers to purchase Coalstar stock. Glover first approached an investment manager at American National Bank and tried to persuade him to approve the investment, but was summarily rebuffed. Glover then arranged a meeting between himself, Lelis, Johnson, and representatives of American National Bank for the purpose of reviewing a presentation by Coalstar describing its coal mining venture in the hope of convincing them to approve the investment. American National Bank again refused, characterizing the venture as high-risk and unsuitable as an investment for the Pension Fund. At a similar meeting held the following day, Wolf, Webb reached the same conclusion. Wolf, Webb soon resigned as money manager of the Pension Fund, in part because of a letter drafted by Glover that directed Wolf, Webb to make the Coalstar investment.

At this juncture, Glover decided to raise the money for the investment by selling some of the Pension Fund's bonds, worth approximately one million dollars, that were being held by the Mid–City National Bank. Glover then drafted, and Johnson signed, a letter that directed the bank to transfer the bonds to Dean Witter Reynolds, which subsequently sold them prior to their maturity date at a loss of over $195,500 to the Pension Fund. Glover and Johnson then invested the proceeds from the sale in Coalstar stock without

advising the Pension Fund's Board of Trustees of their actions, despite the fact that all such sales and investments of Pension Fund assets had to be approved by the Board. Nor was the Board informed of the loss that had been incurred when the Pension Fund's bonds were sold before their maturity. In June and July of 1987, Lelis met three times with Johnson and gave him a total of approximately $135,000 in cash, which Johnson divided equally with Glover. Glover did not apprise his income tax preparer of the money he received in kickbacks, and failed to report the income on his federal income tax return.

In late 1986, Johnson and Glover also entered into a similar scheme with Susan R. Bennett, a stock broker who met with Johnson to recommend various investments for the Union's assets. After Bennett agreed to give a portion of her commission to Johnson, Johnson and Glover met with her on several occasions to discuss possible investments for Union funds. In mid-January 1987, Johnson and Glover invested a total of approximately $1.95 million from the Union's Health and Welfare Fund in Putnam High Income Government Trust, a mutual fund, through Bennett. In early March of the same year, Johnson and Glover made an additional investment of over $4.6 million from the Fund in Kemper–Government Plus Portfolio funds, also through Bennett. Both investments were made without the knowledge or approval of the Board of Trustees of the Health and Welfare Fund. The Kemper investment required the sale of U.S. Treasury notes before their maturity, which was accomplished at Glover's direction, without a vote of the Board of Trustees. Shortly after receiving her brokerage commission from these transactions, Bennett met with Johnson at a local restaurant and gave him $30,000 in cash. Johnson shared the kickback with Glover, each taking $15,000.

In 1989, on the recommendation of an advisory association of pension fund trustees, the Board of Trustees of the Pension Fund began to consider placing approximately ten to fifteen million dollars of the Fund's money in real estate investments. Johnson then spoke with Bennett to confirm that she was still willing to pay kickbacks from the commis-

sions she would earn by brokering the investment of Union monies. After Bennett agreed to make the kickbacks, Glover told Johnson to have Bennett arrange a presentation by several real estate investment firms to be made at a meeting of the Board of Trustees. Johnson and Glover told Bennett not to attend the meeting, and failed to advise the Board of Bennett's role in arranging the presentation or that she would be brokering the proposed transactions. The Board ultimately voted to invest five million dollars in each of two Sierra Capital funds, and five million dollars in a J.M.B. Realty fund. Although the Board authorized these investments, it was never informed that Bennett would be appointed broker of record on its behalf, or indeed that anyone would be paid a commission from the money it had allocated for the investments.

On November 1, 1989, Glover, Johnson and Bennett met for lunch at the Italian Village Restaurant in Chicago to discuss the division of Bennett's brokerage commission. At the meeting, Glover and Johnson made it clear to Bennett that she would be required to give them approximately $400,000 from the commissions she would receive for brokering the three transactions, that in the future she would only meet with Johnson in order to make the kickback payments, and that harm would come to her and her family if she ever mentioned Glover's name or told anyone of the kickback scheme. Bennett began receiving commission checks in late November 1989, and met with Johnson on several occasions to relinquish them. On or about November 29, 1989, Bennett gave Johnson two checks for $50,000 each, which she had endorsed over to Johnson, as well as $6,000 in cash. Bennett again met with Johnson in late January 1990, and gave him three more checks totalling $150,000. All of the checks were eventually cashed at a currency exchange by Timothy Evoy, an acquaintance of Johnson's, for a fee of $2250 per check. A third meeting between Bennett and Johnson took place around February 10, 1990, during which Bennett gave Johnson a paper bag containing $60,000 in cash. A fourth meeting was arranged for the end of February, and Bennett made a final kickback payment of $90,000 in cash to Johnson. Apart from the $6,000 in cash Bennett had paid to Johnson at their first meeting, which Johnson retained for himself, Johnson shared one-half of all the other proceeds from the kickback scheme with Glover. In other words, Glover received a total of $194,375 in kickback payments from Bennett's commissions for brokering the Union's Sierra Capital fund and J.M.B. Realty fund investments. Glover did not, of course, report this income on his federal income tax returns.

After Wolf, Webb resigned in August 1987 from its position as one of the two money managers of the Pension Fund, Glover and Johnson decided to find a replacement. At that time, Glover and Johnson were already acquainted with Ronald Marolda. Marolda met with Johnson and suggested that the Pension Fund appoint M.D. Sass of New York as its money manager. Marolda told Johnson of his plans to start a brokerage firm with a licensed broker named David Nadell, and assured Johnson that he would be willing to make kickback payments if the Pension Fund would agree to place its investments through his firm. Johnson reported this conversation to Glover, who thought they should demand a lump-sum kickback payment from Marolda for having M.D. Sass appointed as the Pension Fund's money manager. After Marolda told Johnson that this would be impossible, but that he and Nadell would agree to make kickback payments from all future commissions they received for the purchase and sale of stocks and bonds on behalf of the Pension Fund and other investors holding accounts with M.D. Sass, Glover agreed to the arrangement. By the end of August 1987, the Pension Fund retained M.D. Sass as its new money manager. Marolda and Nadell soon began dividing the commissions they obtained from the trades that were executed, at first by Nadell alone, and later by their brokerage firm, at the direction of M.D. Sass. Marolda then started making regular kickback payments drawn from those commissions.

Between the end of 1987 and January of 1992, Marolda made at least thirty-six kickback payments to Johnson and Glover. All of these were cash payments that Marolda usually turned over to Johnson, who then

divided the money equally with Glover. For a period of approximately eight months in 1990 and 1991, Marolda did not, however, make any payments. Johnson soon retaliated by directing a representative of M.D. Sass to stop doing business with Marolda's brokerage firm. Marolda then requested a meeting with Glover and Johnson to explain why he had failed to make the kickbacks. At the meeting, which was held at a private club in downtown Chicago, Marolda asserted that he had not earned any commissions from M.D. Sass for about eight months because he had not traded on accounts held by M.D. Sass during that time. Marolda also gave a detailed description of how the commission structure at his brokerage firm worked, and how he arrived at the sum that he eventually turned over to Johnson and Glover. Glover was apparently satisfied with Marolda's explanation of the lapse. After the meeting, Marolda continued to broker transactions made on the Pension Fund's account and began paying kickbacks from his commissions exclusively to Glover, who then assumed the task of dividing the proceeds with Johnson. A total of approximately $100,000 changed hands in this scheme, with Glover's share amounting to one-half that amount. Glover again failed to report the kickback payments on his federal income tax returns.

On January 19, 1995, a federal grand jury returned a twenty-two count indictment against Glover, charging him with conspiracy to conduct the affairs of the CTDU and its Pension and Health and Welfare Funds through a pattern of racketeering activity in violation of 18 U.S.C. § 1962(d) (Count One); soliciting and receiving kickbacks relating to the investments made on behalf of these Funds in violation of 18 U.S.C. §§ 1954 & 2 (Counts Two through Four and Eight through Eighteen); money laundering in violation of 18 U.S.C. §§ 1956(a)(1)(B)(i) & 2 (Counts Five and Six); corruptly influencing and attempting to influence the testimony of a witness before the grand jury in violation of 18 U.S.C. §§ 1512(b)(1) & 2 (Count Seven); and filing false United States Individual Income Tax Returns for the taxable years 1988, 1989, 1990 and 1991 in violation of 26 U.S.C. § 7206(1) (Counts Nineteen through Twenty-two). The indictment also alleged that Glover's property was subject to forfeiture to the federal government because Glover had gained approximately $338,325 from his racketeering activities, and also because he had arranged for $150,000 of the proceeds from several of the kickbacks to be laundered to disguise their illegal source.

Glover's first trial began on April 17, 1995. At trial Glover testified in his own defense concerning, among other things, his role in selecting the Coalstar investment, his choice of Bennett to broker a series of investments for the Health and Welfare Fund, and his role in directing the sale of a number of bonds and federal treasury notes in the Union's portfolio before maturity. On May 8, 1995, the jury declared itself deadlocked, and the district judge ordered a mistrial. The judge then ordered Glover to be retried, and his second trial began on June 5, 1995. This time, Glover elected not to take the stand. The government nevertheless offered a portion of the transcript of Glover's testimony from the first trial over Glover's objection. According to Glover, Federal Rule of Evidence 106 required that nearly all of his prior testimony be entered as evidence in the second trial, or, alternatively, that the entire testimony be excluded. See Fed.R.Evid. 106. After several invitations to Glover's counsel to specify exactly which parts of the transcript of Glover's testimony should in all fairness be read to the jury, and counsel's continued insistence that essentially all be included, the district court overruled Glover's objection. On June 22, 1995, the jury returned a verdict finding Glover guilty of all but Counts Seven and Eleven through Thirteen of the indictment, which involved one instance of witness tampering and three instances of soliciting or receiving kickbacks, respectively. The jury also returned a special verdict requiring Glover to forfeit a total of $325,000 to the government. The district judge then ordered the preparation of a presentence report and set September 21, 1995 as the date for Glover's sentencing.

At Glover's sentencing hearing, the district judge determined that for purposes of calculating Glover's base offense level under the Sentencing Guidelines, the eleven counts of soliciting and receiving kickbacks, the two

counts of money laundering, and the four counts of income tax evasion should each be grouped separately. *See* U.S.S.G. § 3D1.2(d). Glover's base offense level was thus set at 24. The judge then considered whether the base offense level should be increased by two points for obstruction of justice under U.S.S.G. § 3C1.1 on the ground that Glover had committed perjury during his first trial. *See* U.S.S.G. § 3C1.1, comment. (n.3(b)). After carefully reviewing the transcript of Glover's testimony from his first trial, the judge determined that Glover had perjured himself on at least four occasions. The particular examples of perjury that the judge cited were Glover's testimony that he never directed Wolf, Webb to purchase Coalstar stock, his testimony that the money he obtained from Marolda represented the repayment of a loan that Johnson had made to Marolda and Nadell, and his testimony that he never discussed kickbacks with Bennett at the Italian Village luncheon held on November 1, 1989. The judge also noted that Glover's testimony had generally contradicted that of his secretary, and that her testimony was clearly credible. (Sentencing Tr. at 8–9.) Glover's offense level was thus increased by two points to 26, and adjusted further to 28 to reflect the fact that his offenses fell into more than one group of closely related counts. *See* U.S.S.G. § 3D1.4. This offense level yielded a sentencing range of 78 to 97 months. The judge then sentenced Glover to one term of 84 months in prison on the racketeering conspiracy and money laundering counts, and two terms of 36 months in prison on the counts involving kickbacks and income tax evasion, all three terms to be served concurrently. Glover was also ordered to forfeit $325,000, and to pay $16,811.84 to the government to cover the cost of his prosecution. In addition to requiring Glover to serve a three-year term of supervised release, the judge barred Glover from becoming involved in any labor organization (other than as a simple member) for a period of thirteen years after his release. *See* 29 U.S.C. § 504.

## II. DISCUSSION

■ Glover maintains that the district court abused its discretion in admitting into evidence a portion of the transcript of his testimony from his first trial, then denying his request to admit nearly all of that testimony for the purpose of placing it in a proper context as required by Rule 106. Glover further asserts that by allowing the jury to receive an incomplete and misleading picture of his prior testimony, the court deprived Glover of his right to a fair trial. Glover thus maintains that his conviction should be overturned. The government contends, however, that when the district court called upon Glover to specify the portions of his previous testimony that clarified or placed in context those portions submitted by the government, Glover made a strategic decision to insist that nearly all of his prior testimony be read to the jury. According to the government, there was no abuse of discretion when the judge asked Glover to indicate which parts of the transcript should be entered into evidence, then rejected Glover's request to admit essentially the whole transcript.

■ Federal Rule of Evidence 106, which stems from the common law doctrine of completeness, provides:

> When a writing or recorded statement or part thereof is introduced by a party, an adverse party may require the introduction at that time of any other part or any other writing or recorded statement which ought in fairness to be considered contemporaneously with it.

Fed.R.Evid. 106. Under the Rule, a party against whom a fragmentary statement is introduced may demand that any other part of the statement be admitted as would be necessary to clarify or explain the portion already received, and thus to avoid any misleading impression that would be created by offering the statement outside its true context. *E.g., United States v. Haddad,* 10 F.3d 1252, 1258–59 (7th Cir.1993); *United States v. Lewis,* 954 F.2d 1386, 1391 (7th Cir.1992); *see also* Fed.R.Evid. 106 advisory committee's note. It is thus clear from the Rule's underlying purpose that the right to have some other portion of a statement admitted as evidence contemporaneously with the portion already received is not unquali-

fied; indeed, the proponent of the additional evidence sought to be admitted must demonstrate its relevance to the issues in the case, and must show that it clarifies or explains the portion offered by the opponent. *United States v. Sweiss,* 814 F.2d 1208, 1211 (7th Cir.1987) (quoting *United States v. Walker,* 652 F.2d 708, 710 (7th Cir.1981)) (internal quotations omitted); *see Lewis,* 954 F.2d at 1391; *United States v. Velasco,* 953 F.2d 1467, 1474–75 (7th Cir.1992); *United States v. LeFevour,* 798 F.2d 977, 981 (7th Cir. 1986).

As we explained in *Velasco,* the test of admissibility under Rule 106 is conjunctive. Thus, once the proponent of the evidence establishes its relevance, the district court must address the second part of the test, and should do so by asking (1) whether the additional evidence explains the evidence already admitted; (2) whether it places the admitted evidence in its proper context; (3) whether its admission will serve to avoid misleading the trier of fact; and (4) whether its admission will "insure a fair and impartial understanding of all of the evidence." *Velasco,* 953 F.2d at 1475; *see Haddad,* 10 F.3d at 1259; *Sweiss,* 814 F.2d at 1211–12. The district court is, moreover, accorded considerable discretion in determining the admissibility of the additional evidence offered under Rule 106, and its decision will not be disturbed absent an abuse of discretion. *E.g., Lewis,* 954 F.2d at 1392; *Velasco,* 953 F.2d at 1475.

On June 15, 1995, during the course of Glover's retrial, the government informed both Glover and the court of its intention to introduce part of the transcript of Glover's testimony from his first trial. The following day, the government provided Glover's counsel with the specific portion of Glover's testimony that it intended to introduce, which amounted to approximately eleven pages of the transcript of Glover's cross-examination, drawn from a total of 198 pages of prior testimony. On the morning of June 19, 1995, the government presented the district judge with the excerpts from Glover's testimony from his first trial, informing the judge that it would not seek to introduce the testimony if Glover were willing to testify at the retrial.

The judge asked Glover's counsel if there were portions of Glover's testimony that he wanted introduced contemporaneously with the eleven pages selected by the government. Counsel responded that the entire transcript of Glover's testimony should be admitted, lest the jury be misled by certain responses that the defense believed the government had taken out of context. At the close of the morning session, counsel reiterated his request that Glover's entire testimony be admitted.

During the afternoon session of June 20, 1995, after the government's final witness had testified, Glover's counsel announced that Glover would not take the stand. At a sidebar conference, the government indicated that it would offer the excerpts of Glover's testimony from the first trial and Glover objected. The following colloquy then took place:

THE COURT: He is not going to testify. Okay. Well, then we will have to take a recess to check the parts of the transcript. Assuming they are allowed to use it, do you want parts read?

[DEFENSE COUNSEL]: Our position, I guess, is in its entirety.

THE COURT: You want it read in its entirety?

[DEFENSE COUNSEL]: The entirety.

THE COURT: That motion will be denied. If you have some specific parts of it that you want—

[DEFENSE COUNSEL]: Then, Judge, whatever part they want to put in, if they are putting a name in or an investment in, then the entirety of his testimony regarding that name, his relationship to that party or investment should go in.

THE COURT: You have to be more specific than that.

[DEFENSE COUNSEL]: I think we should have argument on what they are offering.

THE COURT: No. I told you if you want me to consider whether parts of it to [sic] clarify or explain are admissible, I will do that. But you just said to me no, you want it all read. I will give you a blanket ruling.

I am not going to require them to read it all.

(Retrial Tr. at 1566–67.)

The judge then called for a recess to allow Glover's attorneys to consider whether they wanted to offer specific parts of Glover's prior testimony. Counsel's suggestion that the first thirty pages be summarized as background information and that the remaining 168 pages be read to the jury was rejected, the judge explaining that "you are entitled certainly to offer any part which you think is necessary to fully understand what [the government is] offering, but that's all." (*Id.* at 1572–73.) The trial later resumed with the government's introduction, over Glover's continued objection, of the eleven pages of Glover's prior testimony.

As this lengthy exposition clearly demonstrates, rather than acceding to the judge's request that he select the portions of his prior testimony that clarified or explained the portions offered by the government, Glover was steadfast in his insistence that the entire transcript, less thirty pages of background information, be read to the jury. In determining whether the judge abused his discretion in refusing Glover's offer, we must therefore consider whether the materials offered by Glover meet our criteria for admissibility under Rule 106. As discussed above, this requires a showing by Glover that the entire transcript is relevant to the issues in the case, and that it qualifies or explains the excerpts offered by the government. *E.g.*, *Velasco*, 953 F.2d at 1474–75. Even at this juncture, however, Glover makes a blanket statement that a selection of pages from the transcript would have been insufficient to insure a fair appraisal of all the evidence, yet he fails to demonstrate that the entire transcript is relevant to the issues raised in this case, *see id.*, or that only the entire transcript, rather than selected portions of it, would have sufficed to qualify or explain the excerpts that were introduced by the government, *see id.* at 1475. Indeed, by citing several examples of short passages from the transcript that Glover maintains would have clarified some of the testimony introduced by the government, Glover undermines his own argument that the court abused its discretion in refusing to allow the entire transcript to be read to the jury.

Glover nevertheless contends that the judge abused his discretion in refusing to admit the entire transcript because he allowed an impermissible consideration to enter into that decision, namely, that it would have taken a long time to read the transcript to the jury. Insofar as Glover maintains that considerations of time should play no role in a judge's decision whether to admit additional evidence under Rule 106, he is mistaken. As this court most recently explained in *Lewis*, the district court's exercise of discretion under Rule 106 would involve

> weighing ... the adequacy of the repair work necessary to correct any potentially misleading impression caused by an incomplete presentation against the waste of time and attention and the unfairness involved in blunting the proponent's presentation of his case when everything is required to be read at one time.

*Lewis*, 954 F.2d at 1392 (quoting *Walker*, 652 F.2d at 713 (7th Cir.1981), and 1 Jack B. Weinstein et al., Weinstein's Evidence para. 106[01] at 106–7 (1979)) (internal quotations omitted). As discussed above, in deciding whether additional evidence should be admitted under Rule 106, a district court must consider, among other things, whether it will "insure a fair and impartial understanding of all of the evidence" in the case. *Velasco*, 953 F.2d at 1475. The amount of time needed to present the additional evidence, although obviously not dispositive, is one factor to be weighed in determining whether fairness requires the evidence to be admitted. *See Lewis*, 954 F.2d at 1392; *Walker*, 652 F.2d at 713–14. It is thus unsurprising that, as one commentator observed, "[a] court is more likely to find that fairness requires completeness when the requesting party wants one more line read, than where he is insisting that twenty additional documents must be introduced." 21 Charles Allen Wright & Kenneth W. Graham, Jr., Federal Practice and Procedure: Evidence § 5077 at 369 (1977).

Glover does, however, raise a more compelling point. He maintains that in a criminal trial, a district court should not al-

low the fact that a significant amount of time would be needed to present the additional evidence to take precedence over considerations of fundamental fairness, particularly where the defendant is then confronted with the dilemma of allowing the jury to hear an incomplete picture of the evidence, or of waiving his Fifth Amendment privilege not to testify in order to correct the mistaken impression created by the incomplete evidence. *See Walker*, 652 F.2d at 713–14. Glover is correct that, in assessing whether "fairness" under Rule 106 requires the admission of additional evidence offered by a criminal defendant, a district judge should be sensitive to the defendant's right to present evidence on his own behalf, as well as his right not to testify. *See id.* (noting that defendant was powerless to remedy distorted picture of his prior testimony without relinquishing his right not to take the stand); *see also United States v. Sutton*, 801 F.2d 1346, 1369–70 (D.C.Cir.1986) (because defendant had constitutional right not to testify, excluded portions of recorded conversation were necessary to rebut government's case, and should have been admitted). As appealing as Glover's argument may be in the abstract, however, in this case he has failed to point to any tangible evidence that he was denied a fair trial because the district judge refused to admit the entire transcript of his earlier testimony. Indeed, Glover has failed to show how the record supports the basic premise underlying his argument, namely, that the judge excluded the transcript merely because of its length, without taking into consideration the impact of that ruling on the fairness of Glover's trial. As we have already observed, Glover has not even demonstrated that the threshold criteria for Rule 106 admissibility, such as relevance, were met here. *Cf., e.g., Walker*, 652 F.2d at 710, 713 (defendant established threshold criteria for admission of proffered evidence); *Sutton*, 801 F.2d at 1369 (same). For a stronger reason, then, his claim that he was denied a fair trial because the judge wrongly excluded Rule 106 evidence proves to be wholly unfounded. We therefore conclude that the judge did not abuse his discretion in denying Glover's request to admit the entire transcript of his testimony from his first trial into evidence at his retrial, and that the judge's ruling did not deprive Glover of his right to a fair trial.

 Glover also challenges the district judge's decision to increase his base offense level by two levels under U.S.S.G. § 3C1.1 on the ground that he perjured himself during his first trial. Glover asserts that the judge erred in applying this enhancement because his finding of perjury was not supported by an adequate factual basis in the record, and that in a "close" case, such as he maintains this to be, the application of the enhancement effectively punishes a defendant for exercising his right to testify contrary to the government's witnesses. The government contends that the district court made the required independent review of the record, and that its factual findings were amply supported by documentary evidence and by the testimony of several witnesses whom the court expressly found to be credible. As with other factual determinations under the Sentencing Guidelines, we review the district court's findings with respect to the obstruction of justice enhancement only for clear error. *United States v. Romero*, 57 F.3d 565, 573 (7th Cir.1995); *United States v. Mounts*, 35 F.3d 1208, 1219 (7th Cir.1994), *cert. denied*, —— U.S. ——, 115 S.Ct. 1366, 131 L.Ed.2d 222 (1995).

 Section 3C1.1 of the Sentencing Guidelines provides for a two-level increase in base offense level where a defendant has willfully obstructed or impeded the administration of justice during the prosecution of the offense for which he is being sentenced, *see* U.S.S.G. § 3C1.1, and Application Note 3 lists perjury as one example of conduct that will support an obstruction of justice enhancement. U.S.S.G. § 3C1.1, comment. (n.3(b)). The guideline thus applies to a case where the defendant testifying under oath has provided "false testimony at his own trial 'concerning a material matter with the willful intent to provide false testimony, rather than as a result of confusion, mistake, or faulty memory.'" *United States v. Johnson–Dix*, 54 F.3d 1295, 1311–12 (7th Cir.1995) (quoting *United States v. Dunnigan*, 507 U.S. 87, 94, 113 S.Ct. 1111, 1116, 122 L.Ed.2d 445 (1993)). As the Supreme Court explained in *Dunnigan*, where a defendant objects to the imposi-

tion of this enhancement on the basis of his trial testimony, the district judge "must review the evidence and make independent findings necessary to establish a willful impediment to or obstruction of justice" under this definition. 507 U.S. at 95, 113 S.Ct. at 1117. In applying this standard to *Dunnigan*, the Supreme Court then determined that the district judge's imposition of the enhancement was well supported in light of "the numerous witnesses who contradicted [Dunnigan] regarding so many facts [about] which she could not have been mistaken." *Id.* at 95–96, 113 S.Ct. at 1117.

We conclude that the same reasoning applies to Glover's testimony at his first trial. In imposing the obstruction of justice enhancement for perjury, the judge made an independent review of the record and specifically referred to three examples of willfully false statements Glover had made under oath on matters material to the charges against him. These were (1) that he never directed Wolf, Webb to purchase Coalstar stock with monies from the Pension Fund; (2) that he believed that the money he received from Marolda was merely repayment for a loan Johnson had made to Marolda; and (3) that the meeting with Johnson and Bennett at the Italian Village Restaurant involved no discussion of kickbacks. In addition, the district judge made a general finding that Glover perjured himself on a fourth occasion when he testified contrary to his secretary, Kathy Rugendorf, and that Rugendorf had clearly testified in a truthful manner. (Sentencing Tr. at 8–9.) With respect to the first three instances cited, the district judge found that documentary evidence and testimony clearly established that Glover had directed Wolf, Webb to purchase the Coalstar stock, and that Glover's description, under oath, of the letter he wrote to Wolf, Webb as merely a "pimp" was a "blatant piece of perjury" (*Id.* at 8.) The judge further found that Glover's description of the kickbacks he received from Marolda as mere loan repayments, and his denial that kickbacks were even discussed at the Italian Village luncheon, were equally blatant instances of perjury. (*Id.* at 9.) In making these findings, the judge thus complied in every respect with the requirements of *Dunnigan;* moreover, we discern no error, clear or otherwise, in the judge's factual determinations. As in *United States v. Jones*, 983 F.2d 1425 (7th Cir.1993), this is plainly not a case for giving Glover "the benefit of the doubt, as we would if this were a close call." *Id.* at 1431; *see* U.S.S.G. § 3C1.1, comment. (n.1). We therefore reject Glover's challenge to the two-point enhancement of his base offense level for obstruction of justice.

### III. CONCLUSION

For the reasons stated above, Glover's conviction and sentence are

AFFIRMED.