



FILED

Dec 04 2018, 3:24 pm

CLERK
Indiana Supreme Court
Court of Appeals
and Tax Court

# IN THE

# Indiana Supreme Court

Supreme Court Case No. 31S00-1703-LW-134

## Kevin Andrew Schuler

*Appellant (Defendant),*

—v—

## State of Indiana

*Appellee (Plaintiff).*

---

Argued: September 13, 2018 | Decided: December 4, 2018

Appeal from the Harrison Superior Court, No. 31D01-1308-MR-508

The Honorable Vicki L. Carmichael, Special Judge

On Direct Appeal

---

**Opinion by Justice David**

Chief Justice Rush and Justices Massa, Slaughter, and Goff concur.

**David, Justice**

Defendant Kevin Andrew Schuler pled guilty to the murder of Asenath Arnold and to felony murder for the death of Gary Henderson at the hands of his accomplice Austin Scott. Schuler was sentenced to life without parole for the murder charge and received a consecutive sixty-five-year sentence for the felony murder. Schuler raises four issues in this appeal, arguing a violation of his *Miranda* rights, insufficient evidence to support his sentence, that his sentence was inappropriate, and failure of the trial court to meet certain requirements in its sentencing statement. We affirm the trial court on each of Schuler's first three claims but remand this matter for a new sentencing statement.

## Facts and Procedural History

Asenath Arnold was found dead in her Harrison County farm home on the morning of August 3, 2013. Arnold, a mostly-bedridden fifty-seven-year-old woman, had been brutally beaten in her bedroom; her head was significantly disfigured, and blood was splattered on the walls and pooled underneath her bed. Gary Henderson, who slept in an upstairs bedroom in the same home, was also found dead with multiple stab wounds.

Later that day in adjacent Floyd County, New Albany police officers responded to a call about gun shots fired in a residential neighborhood. Police located Austin Scott and Defendant Kevin Schuler shortly thereafter and placed them under arrest. After *Miranda* warnings were given to both individuals, Scott offered that he "killed a man last night" and that Schuler killed someone as well. (Tr. Vol. 3 at 238, Tr. Vol. 5 at 104, 107). Police confirmed that Harrison County was working a double homicide and took Schuler to the Floyd County Sherriff's Department for further questioning.

At the police station, interrogators learned that Schuler and Scott were driving a four-wheeler early that morning and stopped at Arnold and Henderson's farmhouse to siphon gas from a tractor. Schuler knew the home because he had done work on the property a few years earlier. Schuler admitted to police that he followed Scott into the home where

Scott pulled out a knife, went upstairs, and killed Henderson. The two took several items from the house including rifles and prescription medication but returned when Schuler realized he left his backpack at the scene. Schuler and Scott re-entered the home to see if they could find any more pills. At some point, Schuler found a singletree—a wooden bar normally used to hold horses together—on the property and carried it into the house.

Once Schuler and Scott were back in the house, Arnold called out to the intruders and started to emerge from her bedroom on the first floor. Schuler punched Arnold and she stumbled back to her bed. Schuler then took the singletree and struck Arnold on top of her head. Arnold prayed and pleaded with Schuler for her life. According to Scott, Schuler swung the singletree with two hands "like a sledgehammer," striking Arnold at least twice and as many as four times. (St. Ex. 30-4 at 47:53-52:00). In addition to Schuler hitting Arnold with the singletree, Scott also stabbed her in the face. Although he couldn't be completely sure whether he or Scott killed Arnold, Schuler told police, "I'm almost positive I killed her." (Tr. Vol. 2 at 250). An autopsy determined Arnold died of multiple blunt force injuries and sharp force wounds to the head. Schuler and Scott took Arnold's rings and medication before leaving the home.

Schuler was charged with three counts of murder, Class A felony robbery, Class A felony burglary, and Class D felony theft. The State subsequently filed a notice of intent to seek the death penalty, alleging that Schuler intentionally killed Arnold while committing the crime of robbery. Schuler ultimately pled guilty to Count 1, murder, and Count 2, felony murder, and in exchange, the State agreed to dismiss its request for the death penalty and instead requested a sentence of life imprisonment without parole under Indiana Code section 35-50-2-9. The parties agreed that the trial court alone would conduct the sentencing hearing to determine whether life without parole or a term of years would be imposed. At the sentencing hearing, the trial court verbally gave its reasons for the ultimate sentence, including a discussion of potential aggravating and mitigating factors. Schuler was sentenced to life without parole on Count 1 and sixty-five (65) years on Count 2 to be served consecutively.

The present appeal ensued, which we accepted under mandatory review pursuant to Indiana Rule of Appellate Procedure 4(A)(1)(a). Additional facts will be presented below as necessary.

# Discussion and Decision

Schuler raises four issues on appeal, which we restate as follows: (1) whether Schuler's *Miranda* rights were violated during a custodial interrogation; (2) whether there was sufficient evidence to prove beyond a reasonable doubt that Schuler intentionally killed Asenath Arnold; (3) whether Schuler's sentence was inappropriate; and (4) whether the trial court's sentencing statement complied with *Harrison v. State* and reflects appropriate sentencing considerations. We will analyze each issue in turn.

## I.  Schuler's *Miranda* rights were not violated.

Schuler first argues that his *Miranda* rights were violated when police failed to stop all questioning after he requested his attorney during a police interrogation. Schuler was interrogated on two separate occasions by Harrison County Detective Nick Smith: first after Schuler was stopped and arrested in New Albany and second when Schuler was taken to the Floyd County Police Department about an hour later. During the second interrogation, the following interaction took place:

---

DET. SMITH: All right. You have the right to remain silent. Anything you say can and will be used against you in court. You have the right to consult with an attorney and have that attorney present during questioning. If you cannot afford an attorney, one will be provided for you before any questioning at — at no cost. If you choose to answer any questions we'd ask you now, you still have the right to stop answering questions at any time, that never changes. Do you understand that?

MR. SCHULER: Have my attorney now?

DET. SMITH: It's up to you. If you ask me for an attorney, I can't ask you no more questions.

MR. SCHULER: This isn't recorded or nothing.

DET. SMITH: Everything we do is recorded, buddy. I've got to tell your story and I've got to tell the truth. I don't want to hide nothing. If you want an attorney, tell me now, and then I will not ask you any questions.

MR. SCHULER: I — I want my attorney, but I'll answer, you can ask me questions however.

DET. SMITH: You got to be specific, buddy. I mean, if you're telling me you want an attorney, I cannot talk to you any more.

MR. SCHULER: You — you can go ahead and talk to me, that's fine.

DET. SMITH: Are you — I can't really even ask you. Are you saying you want to talk to an attorney before you talk to me?

MR. SCHULER: No, you can go ahead.

DET. SMITH: Are you positive?

MR. SCHULER: Yes.

DET. SMITH: Okay. So you want to talk to me?

MR. SCHULER: Yes, sir.

DET. SMITH: Okay. Did you mean a minute ago that you wanted an attorney first?

MR. SCHULER: Oh, no, I have an attorney. I don't know if I'm supposed to talk to him first or you. It doesn't matter, I'll go ahead and talk to you.

DET. SMITH: Only if you want to, buddy.

MR. SCHULER: Yeah.

---

(Tr. Vol. 2 at 156-57). In the course of the interrogation that followed this exchange, Schuler gave details about the two murders and admitted that he at least played a role in the death of Asenath Arnold—eventually stating, "I'm almost positive I killed her." (Tr. Vol. 2 at 244, 250).

Before entering his guilty plea, Schuler moved to suppress these statements, arguing that he unambiguously and unequivocally requested an attorney. Thus, the interview should have stopped, and any statements made after this invocation of his right to counsel should have been suppressed. The trial court, however, denied Schuler's motion and proceeded to accept his guilty plea.

Schuler asks our Court to find that his Fifth Amendment right to an attorney was violated and that his motion to suppress should have been granted. When a trial court denies a motion to suppress, we review this denial in a manner similar to other sufficiency issues. *Hartman v. State*, 988 N.E.2d 785, 788 (Ind. 2013). We do not reweigh evidence and there "must be substantial evidence of probative value in the record to support the trial court's decision." *Id.* Within this sufficiency review, we review all issues of law *de novo*. *Id.*

To the extent Schuler claims his request for an attorney was unambiguous and unequivocal, we disagree. When a person is questioned by law enforcement officers after being taken into custody, that person must first "be warned that he has a right to remain silent, that any statement he does make may be used as evidence against him, and that he has a right to the presence of an attorney, either retained or appointed." *Miranda v. Arizona*, 384 U.S. 436, 444, 86 S.Ct. 1602, 1612, 16 L.Ed.2d 694 (1966). Once the accused requests counsel, "the interrogation must cease until an attorney is present." *Carr v. State*, 934 N.E.2d 1096, 1102 (Ind. 2010) (citing *Edwards v. Arizona*, 451 U.S. 477, 482, 101 S.Ct. 1880, 1883, 68 L.E.2d 378 (1981)). This request, however, must be "unambiguous and unequivocal." *Carr*, 934 N.E.2d at 1102 (citing *Berghuis v. Thompkins*, 560 U.S. 370, 379, 130 S.Ct. 2250, 2259, 176 L.E.2d 1098 (2010)).

Police investigators are not required to stop questioning "if a suspect makes a reference to an attorney that is ambiguous or equivocal in that a

reasonable officer in light of the circumstances would have understood only that the suspect *might* be invoking the right to counsel." *Davis v. United States*, 512 U.S. 452, 459, 114 S.Ct. 2350, 2355, 129 L.Ed.2d 362 (1994) (emphasis in original). If a defendant's statements are unclear, police may ask clarifying questions to determine whether the accused has actually requested counsel. *See Bailey v. State*, 763 N.E.2d 998, 1003 (Ind. 2002). However, as Schuler argues, "an accused's *postrequest* responses to further interrogation may not be used to cast retrospective doubt on the clarity of the initial request itself." *Smith v. Illinois*, 469 U.S. 91, 100, 105 S.Ct. 490, 495, 83 L.Ed.2d 488 (1984) (emphasis in original). *See also Sleek v. State*, 499 N.E.2d 751, 754 (Ind. 1986) ("Even if [an accused's] request was perceived to be inherently ambiguous, or equivocal in light of the preceding events, any further questioning should have been narrowly limited to clarifying whether [the accused] actually wished to have counsel present.").

At issue here is Schuler's statement, "I want my attorney, but I'll answer, you can ask me questions however." In examining courts' prior treatment of similar statements, we cannot agree that this statement is an outlier or even on the bleeding edge of *Miranda*'s jurisprudence. In *Davis*, for example, the Supreme Court of the United States found the defendant's statement, "[m]aybe I should talk to a lawyer," to be ambiguous and therefore not a request for counsel. 512 U.S. at 462, 114 S.Ct. at 2357. Similarly, in *Bailey*, 763 N.E.2d at 1003, our Court found the statement, "I may need a what do you call it … a [*sic*] appointed … oh appointed attorney" to be an ambiguous request for counsel, and in *Taylor v. State*, 689 N.E.2d 699, 703 (Ind. 1997), the statement, "I guess I really want a lawyer, but, I mean, I've never done this before so I don't know" was also found to be an ambiguous request. Schuler's statement, in light of the circumstances, was arguably more ambiguous than the statements made in each of these cases.

Schuler argues, however, that Detective Smith failed to honor his plain request for an attorney. In support, Schuler points to *Anderson v. State*, 961 N.E.2d 19, 26 (Ind. Ct. App. 2012), *trans. denied*, a case in which our Court of Appeals found the defendant's statement, "I really would like to talk to an attorney or something," to be an unequivocal invocation of a right to counsel. The Court of Appeals reasoned that the addition of "or

something" to the otherwise clear request for counsel did not make the statement equivocal. *Id.* at 27. Rather, the phrase "or something" appeared to be a habit of speech, and given the reality of an interrogation room, the court was satisfied that the entire statement was a clear request for an attorney. *Id.*

Schuler's statement, "I want my attorney, but I'll answer, you can ask me questions however" does not carry the same unambiguous tones of the *Anderson* statement. A reasonable officer in light of the circumstances would have found Schuler's statement to be ambiguous. The phrase "but I'll answer, you can ask me questions however" was not a habit of speech; it was permission to continue questioning. Even so, Detective Smith confronted the issue directly, asking, "Did you mean a minute ago that you wanted an attorney?" (Tr. Vol. 2 at 157). Schuler responded, "Oh, no, I have an attorney. I don't know if I'm supposed to talk to him first or to you. *It doesn't matter, I'll go ahead and talk to you.*" (*Id.* (emphasis added)). Schuler's statements, at minimum, show that he was aware of his right to an attorney but chose to speak with the detective anyway. Furthermore, we do not think Detective Smith's clarifying questions injected any retrospective doubt into Schuler's ambiguous statement. The detective acted as any reasonable police officer would in this circumstance and even made sure Schuler understood that the interview would stop if he was truly requesting an attorney.

A defendant's statement is either "an assertion of the right to counsel or it is not." *Davis*, 512 U.S. at 459 (citation omitted). Here, Schuler's statement was not an unambiguous request for counsel. We are satisfied Schuler's *Miranda* rights were honored during this custodial interrogation and affirm the trial court's denial of Schuler's motion to suppress.

## II. There was sufficient evidence beyond a reasonable doubt that Schuler intentionally killed Arnold.

Schuler next argues that there was insufficient evidence to support the aggravating circumstance that made him eligible for a life without parole sentence. We review the sufficiency of the evidence to support a statutory

aggravating circumstance in the same way we review the sufficiency of evidence to convict. *Krempetz v. State*, 872 N.E.2d 605, 609 (Ind. 2007). We examine only the probative evidence and reasonable inferences supporting the verdict and do not reweigh the evidence or assess witness credibility. *Love v. State*, 73 N.E.3d 693, 696 (Ind. 2017). We look to see if the evidence "constitutes substantial evidence of probative value from which a reasonable trier of fact could find the existence of the aggravator beyond a reasonable doubt." *Krempetz*, 872 N.E.2d at 609 (citing *Fleenor v. State*, 622 N.E.2d 140, 151 (Ind. 1993)).

In general, when the State seeks to impose a sentence of life without parole for murder, it must allege at least one aggravating circumstance listed in the life without parole statute. Ind. Code § 35-50-2-9(a). In this case, the State alleged Schuler committed murder by intentionally killing Arnold while committing burglary.[1] Ind. Code § 35-50-2-9(b)(1). A person engages in conduct "intentionally" if, "when he engages in the conduct, it is his conscious objective to do so." Ind. Code § 35-41-2-2(a). Intent to kill may be inferred from the intentional use of a deadly weapon in a manner likely to cause death or great bodily injury. *Landress v. State*, 600 N.E.2d 938, 941 (Ind. 1992). A deadly weapon includes "material that in the manner it … is used … is readily capable of causing serious bodily injury." Ind. Code § 35-31.5-2-86(a)(2).

In the present case, there was substantial evidence beyond a reasonable doubt that Schuler intentionally killed Arnold during the commission of a burglary. Although a singletree isn't generally used as a weapon, the manner in which Schuler used it was readily capable of causing serious bodily injury. Schuler admitted as much, noting that he used both hands to swing the singletree down on top of Arnold's head and was "almost positive" that he killed her. (Tr. Vol. 2 at 250). The inference of Schuler's intent to kill can be further bolstered by Scott's statements that he saw Schuler strike Arnold with the singletree "like a sledgehammer" at least

---

[1] Schuler does not contest that this criminal act took place during the commission of a burglary.

twice (St. Ex. 30-4 at 48:13–48:23) and a forensic pathologist's report that the blunt force injuries directly contributed to Arnold's death.

We affirm the trial court court's finding of the aggravating circumstance beyond a reasonable doubt that Schuler intentionally killed Arnold during the burglary of Arnold's home.[2]

## III. Schuler's sentence of life without parole is appropriate.

Schuler argues that his sentence is inappropriate and urges us to exercise our constitutional power to review and revise his sentence. Ind. Const. Art. 7, § 4. Under our appellate rules, we will revise a sentence only if we find that it "is inappropriate in light of the nature of the offense and the character of the offender." Ind. Appellate Rule 7(B). Our goal in applying 7(B) review is not to achieve a perceived "correct" sentence, but rather to leaven the outliers. *McCallister v. State*, 91 N.E.3d 554, 566 (Ind. 2018). In conducting this review, we "defer to the trial court's sentence and impose on the defendant the burden of persuading us that a revised sentence is warranted." *Id*. (citing *Rice v. State*, 6 N.E.3d 940, 946 (Ind. 2014)).

Schuler argues the trial court abused its discretion by considering the Indiana Risk Assessment System ("IRAS") as an aggravating circumstance or counterweight to a mitigating circumstance, not giving proper consideration to his age and brain development, and placing weight on the victims' innocence. We disagree and find no abuse of discretion.

First, courts may properly consider offender assessment instruments such as the IRAS as supplemental tools during the sentencing phase of a

---

[2] Schuler argues that the trial court relied on conjecture that Schuler killed Arnold only because she recognized him. That argument, however, goes to Schuler's motive rather than intent. Even if we were to accept this argument as true, the trial court still could have found this aggravating circumstance beyond a reasonable doubt based on the way Schuler used the singletree as a deadly weapon.

trial.  *Malenchick v. State*, 928 N.E.2d 564, 575 (Ind. 2010).  While the IRAS itself does not serve as an aggravating or mitigating circumstance, it nevertheless "may be considered by a trial judge in reaching an informed sentencing decision."  *Id.* at 574.  Although the trial court in this case did reference the IRAS during sentencing, it did not place any special weight on the IRAS findings.  Instead, the court mentioned it briefly before moving on to a host of other factors it considered during sentencing.

Second, Indiana Code section 35-50-2-9(c)(7) allows a court to consider as a mitigating circumstance whether the defendant was less than eighteen at the time the murder was committed.  Schuler points to *Miller v. Alabama*, 567 U.S. 460, 473, 132 S.Ct. 2455, 2465, 183 L.Ed.2d 407 (2012), arguing "youth matters in determining the appropriateness of a lifetime of incarceration without the possibility of parole."  While we agree with this general proposition, *Miller* dealt with two fourteen-year-old offenders that received a mandatory life without parole sentence.[3]  *Id.* at 465, 132 S.Ct. at 2460.  Here, the trial court pointed out that Schuler was eighteen years old at the time he committed the murder, that the law treats eighteen-year-olds as adults, and that Schuler seemed to comprehend the consequences of murder when he asked the detective, "I'm going to spend the rest of my life in prison, aren't I?"  (Tr. Vol. 7 at 155).  It was within the court's discretion to not place great weight on Schuler's age.

Third, there is a presumption that a trial court that conducts a sentencing hearing "renders its decision solely on the basis of relevant and probative evidence."  *Veal v. State*, 784 N.E.2d 490, 493 (Ind. 2003).  There is no indication here that the trial court placed any significant weight on victim impact when it mentioned "two innocent victims who will never have Christmas with their families."  (Tr. Vol. 7 at 156).  Schuler fails to persuade us otherwise.

---

[3] In *Miller*, the Supreme Court of the United States struck down Alabama's and Arkansas's mandatory life without parole statutes for offenders under the age of eighteen, citing the Eighth Amendment's ban on cruel and unusual punishment.  567 U.S. at 489, 132 S.Ct. at 2475.

Schuler also argues that a term of years is a more appropriate sentence than life without parole. He argues that his age, troubled family history, and lack of substantial criminal history should weigh in favor of his character. While it is true that "a trial court should reserve maximum sentences for classes of offenses that constitute the worst of the worst," *Hamilton v. State*, 955 N.E.2d 723, 727 (Ind. 2011), Schuler did not receive the maximum sentence in this case. Instead of being sentenced to death or to consecutive life sentences for the murder and felony murder charges, Schuler received a life without parole sentence and a sixty-five-year consecutive sentence. We are also not persuaded that Schuler's sentence is an outlier. *See, e.g., Helsley v. State*, 43 N.E.3d 225, 229 (Ind. 2015) (defendant's sentence of life without parole was appropriate for the double murder of two coworkers despite alleging troubled childhood and lack of criminal history); *Krempetz*, 872 N.E.2d at 605, 615 (affirming consecutive life without parole, forty-five year term, and twenty-year term sentences when an 18-year-old defendant committed intentional murder during the robbery of a woman where the defendant had no criminal or juvenile history but admitted to drug use).

We therefore conclude that Schuler's sentence was appropriate in light of the nature of the offense and his character.

## IV. The sentencing statement did not comply with the dictates of *Harrison v. State*.

Schuler's final argument is that the trial court failed to comply with the requirements set forth in *Harrison v. State* and impermissibly considered nonstatutory aggravators when it sentenced him to life imprisonment without parole. We review a trial court's sentencing order for an abuse of discretion. *Rice*, 6 N.E.3d at 943 (citing *Anglemyer v. State*, 868 N.E.2d 482, 490 (Ind. 2007)). An abuse of discretion occurs if a trial court enters a sentencing statement explaining the reasons for imposing the given sentence, "but the record does not support the reasons or the sentencing statement omits reasons that are clearly supported by the record and advanced for consideration, or the reasons given are improper as a matter of law." *Id*.

When trial judges exercise discretion over the sentence imposed for the death penalty or life imprisonment without parole, the court must comply with the requirements outlined in *Harrison v. State*, 644 N.E.2d 1243, 1262 (Ind. 1995). *See also Rice*, 6 N.E.3d at 943 (affirming the use of *Harrison* factors when the judge alone makes the sentencing determination after the defendant enters a guilty plea). Under *Harrison*, we require that sentencing findings in capital cases:

> (i) must identify each mitigating and aggravating circumstance found, (ii) must include the specific facts and reasons which lead the court to find the existence of each such circumstance, (iii) must articulate that the mitigating and aggravating circumstances have been evaluated and balanced in determination of the sentence, and (iv) must set forth the trial court's personal conclusion that the sentence is appropriate punishment for this offender and this crime.

*Harrison*, 644 N.E.2d at 1262 (internal citations omitted). These requirements are in place to "insure [*sic*] the trial court consider[s] only proper matters when imposing [a] sentence…and to enable the appellate court to determine the reasonableness of the sentence imposed." *Id.*

The trial court in the present case verbally discussed its sentencing decision from the bench. Examining the trial court's statements at sentencing, we can only make out the rough silhouettes of each *Harrison* factor, none of which come into clear focus.

As to the first and second *Harrison* factors, the trial court clearly identified the aggravating circumstance of an intentional killing during the commission of a robbery, but also referenced "other aggravating circumstances," none of which are readily identifiable from the court's statements. (Tr. Vol. 7 at 156). While the life without parole sentencing statute requires only one aggravating circumstance, *see* Ind. Code § 35-50-2-9(a), we have consistently held that, in the context of life imprisonment without parole, courts must, "limit the aggravating circumstances eligible for consideration to those specified in the…statute." *Clippinger v. State*, 54 N.E.3d 986, 991-92 (Ind. 2016) (quoting *Pope v. State*, 737 N.E.2d 374, 383

(Ind. 2000)).  Without any clear indication of what "other aggravating circumstances" the court considered, we cannot ensure only proper matters were considered.

Similarly, it is not clear to us that the sentencing statement meets the third *Harrison* factor.  Although the trial court found that the "aggravating circumstances outweigh any mitigating circumstances," (Tr. Vol. 7 at 156), it is hard to assess how the court balanced the factors without specific identification of any mitigating factors.  While courts are not required to find mitigating circumstances, s*ee Clippinger*, 54 N.E.3d at 992, the court here at least hinted at several factors it considered in determining Schuler's sentence.  Without specificity, it is difficult for us as an appellate court to review the imposition of the sentence.

As to the final *Harrison* factor, the court's statements imply that it came to the personal conclusion that the sentence was appropriate.  At the beginning of its statement, the trial court noted, "nothing I do here today is probably going to allow you to see [Schuler] outside of prison walls…I have to decide whether life in prison or a term of years is appropriate." (Tr. Vol. 7 at 152).  After discussing the various factors at issue in the case, the trial court concluded by "impos[ing] a sentence of life without the possibility of parole for the murder of Asenath Arnold." (Tr. Vol. 7 at 156).  But without clear substance between these two statements, we cannot say with certainty that "[t]he court's balancing of the evidence emphatically displays its discrete, individualized sentencing." *Azania v. State*, 730 N.E.2d 646, 653 (Ind. 2000) (quoting *Allen v. State*, 686 N.E.2d 760, 790 (Ind. 1997)).

For these reasons, we do not think the requirements of *Harrison* have been met.  If a sentencing statement does not meet the requirements of the law, "we are unwilling to affirm [a] sentence of life without parole." *Brown v. State*, 783 N.E.2d 1121, 1129 (Ind. 2003).  There are three options, then, that we must consider: "(1) remand the matter to the trial court for clarification or a new sentencing determination; (2) affirm the sentence if the error is harmless; or (3) independently reweigh the proper aggravating and mitigating circumstances." *Id*.  As a practical matter, we have previously given trial courts the opportunity to revise a sentencing

statement if it does not conform to the requirements of *Harrison*.  *See, e.g.,* *Clippinger*, 54 N.E.3d at 987, 991-92 (reweighing aggravating and mitigating circumstances after an initial remand for a clearer sentencing statement); *Brown*, 783 N.E.2d at 1129 (electing to independently evaluate aggravating and mitigating circumstances after already remanding for a revised sentencing order).  We elect to follow the same course here.  As in *Harrison*, we must "stand firm and require a clear demonstration that the essential operations" of the life without parole sentencing process have taken place.  644 N.E.2d at 1264 (citation omitted).

We therefore remand this matter to the trial court for a clearer sentencing statement that complies with the dictates of *Harrison*.

## Conclusion

For the foregoing reasons, we affirm that Schuler's *Miranda* rights were not violated, there was sufficient evidence beyond a reasonable doubt to prove the necessary aggravating factor of an intentional killing during the commission of a robbery, and that Schuler's sentence is appropriate.  We remand this matter, however, for a more specific sentencing statement consistent with *Harrison*.

Rush, C.J., and Massa, Slaughter, and Goff, JJ., concur.

ATTORNEYS FOR APPELLANT
Brent Westerfeld
Andrew J. Borland
Indianapolis, Indiana

ATTORNEYS FOR APPELLEE
Curtis T. Hill, Jr.
Attorney General of Indiana

Andrew A. Kobe
Jesse R. Drum
Deputy Attorneys General
Indianapolis, Indiana

Joshua Otto Schalk
Harrison County Prosecuting Attorney
Corydon, Indiana