## MEMORANDUM DECISION

Pursuant to Ind. Appellate Rule 65(D), this Memorandum Decision shall not be regarded as precedent or cited before any court except for the purpose of establishing the defense of res judicata, collateral estoppel, or the law of the case.



FILED

Jun 20 2019, 9:02 am

CLERK
Indiana Supreme Court
Court of Appeals
and Tax Court

ATTORNEY FOR APPELLANT

Kay A. Beehler
Terre Haute, Indiana

ATTORNEYS FOR APPELLEE

Curtis T. Hill Jr.
Attorney General

Jesse R. Drum
Supervising Deputy Attorney
General
Indianapolis, Indiana

# IN THE
# COURT OF APPEALS OF INDIANA

| | |
|---|---|
| Bonnie Hanning, <br> *Appellant-Defendant,* <br><br> v. <br><br> State of Indiana, <br> *Appellee-Plaintiff* | June 20, 2019 <br><br> Court of Appeals Case No. 18A-CR-3093 <br><br> Appeal from the Vermillion Circuit Court <br><br> The Honorable Robert M. Hall, Special Judge <br><br> Trial Court Cause No. 83C01-1610-CM-271 |

**Vaidik, Chief Judge.**

# Case Summary

[1] Bonnie Hanning, who is charged with animal cruelty, appeals the denial of her motion to suppress evidence. We affirm.

# Facts and Procedural History

[2] In the fall of 2016, Hanning was offering animals for adoption/purchase out of her home in rural Vermillion County under the name Troll Keep Kitty Haven. On October 13, Vermillion County Deputy Sheriff Chad Akers requested a search warrant for the property and appeared before Vermillion Circuit Court Judge Bruce Stengel to provide a factual basis. Deputy Akers testified that the previous day, October 12, he "received two separate reports of animal neglect," Tr. Vol. III p. 42, from two unrelated women who had each purchased a kitten from Hanning. One of the women was Gretchen Cox, and Deputy Akers mistakenly referred to both women by that name, but for purposes of this appeal there is no dispute that the other woman was Stephanie Johnson. (One of the women was from Schererville, Indiana, the other from Jacksonville, Illinois. The record is unclear as to which woman was from which town and as to which woman Deputy Akers spoke to first and which woman he spoke to second. However, Hanning does not dispute that Deputy Akers spoke with both women on October 12.)

[3] According to Deputy Akers, one of the women reported that she met Hanning at a park on August 20 to purchase a kitten after locating the kitten on a website

called Petfinder. The woman explained that a week later the kitten "started acting drunk-like," "wasn't able to stand," and "would fall off the couch"; that "she took it to the vet at which time the vet said that the animal had not been vaccinated, hadn't been taken care of, it was obviously not eating, it was malnourished"; that when she purchased the kitten she was given paperwork indicating that it had been vaccinated for rabies at a vet clinic in Terre Haute but that when she called the clinic she was told that it "had no record of that rabies shot ever being given to that animal"; and that she was "waiting on some more blood work to come back from the animal." *Id.* at 43.

[4] Deputy Akers testified that the second woman reported a similar experience: that she purchased a kitten from Hanning; that "in the first week the kitten appeared to be fine then it started not sleeping and not eating"; that the kitten "started falling over" and "just appeared like it was intoxicated"; and that "the day previous to yesterday and yesterday she had vet visits with ultimately that cat having to be euthanized" because "the vet said that it had a parasite that he hadn't seen in fifteen (15) years." *Id.* at 45.

[5] After speaking to the two women, Deputy Akers "look[ed] into Ms. Hanning a little bit further[.]" *Id.* He testified that "over the past few years there have been eight (8) separate incidences from various people throughout the state reporting an animal neglect" and that "[e]very time that an officer would try to go out and make contact with Ms. Hanning she wouldn't answer the door[.]" *Id.* at 45-46.

[6] Deputy Akers then described how he went to Hanning's property on the afternoon of October 12 in an attempt to contact her. He said that he "went back a long lane that's back in the woods" and "came into contact with multiple buildings throughout the wooded area." *Id.* at 46. He testified that "[t]he vehicle that was identified in delivering the kittens"—a white Toyota van—was on the property. *Id.* Deputy Akers "knocked on the doors" of one or more of the buildings. *Id.* at 47. Hanning did not answer, but Deputy Akers could hear "dog collars kinda shaking about" inside. *Id.* Deputy Akers said he also saw one dog in a fenced-in area outside the house. Deputy Akers testified that he took photos of "the entire property," *id.* at 49, and thirty-four printed photos were submitted to Judge Stengel as an exhibit. The photos depict, among other things: several buildings; garbage, toys, animal cages, and other items piled up and scattered around the property; and a variety of vehicles, including a white Toyota van parked in the driveway. *Id.* at 5-38.

[7] Finally, Deputy Akers testified that he went onto Petfinder.com and saw that Troll Keep Kitty Haven had thirty-five "adoptable" animals posted. *Id.* at 50. A printoff from the website showing some of the animals was submitted to Judge Stengel as an exhibit. *See id.* at 39.

[8] At the end of the hearing, Judge Stengel issued the requested warrant. Deputy Akers immediately returned to Hanning's property with several other people from the county and the Humane Society and executed the search warrant. According to Deputy Akers, they found filthy living conditions, overwhelming

odors, and almost 100 animals (fifty-six cats, ten dogs, and twenty-six birds), many of them in poor health. *See* Appellant's App. Vol. II pp. 22-23.

[9] The State charged Hanning with ten counts of cruelty to an animal, a Class A misdemeanor. *See* Ind. Code § 35-46-3-7. Hanning filed a motion to suppress evidence, asserting that Deputy Akers "conducted a warrantless search of the curtilage attached to Defendant Hanning's home" during his first visit to the property on October 12, 2016. Appellant's App. Vol. II p. 169. She argued that this alleged search violated the Fourth Amendment to the U.S. Constitution and Article 1, Section 11 of the Indiana Constitution and that all evidence obtained during that visit (i.e., Deputy Akers's outdoor observations and photographs of Hanning's property) should therefore be excluded. Hanning also sought the exclusion of the evidence obtained when the warrant was executed, since the warrant was issued based in part on Deputy Akers's allegedly illegal observations and photographs from October 12.

[10] Special Judge Robert Hall held a hearing on Hanning's motion in October 2018. Deputy Akers testified again and provided a variety of details about his initial investigation that he did not mention at the search-warrant hearing. Relevant here, he said that during his visit to Hanning's property on October 12, he went "[f]ive or six steps from the drive" to take a photo of the dog that was penned up outside. Tr. Vol. II p. 21.

In November 2018, Judge Hall issued a written order denying Hanning's motion to suppress. He then certified his order for interlocutory appeal, and we accepted jurisdiction.

# Discussion and Decision

Hanning contends that the trial court erred by denying her motion to suppress. We review the denial of a motion to suppress like we do other sufficiency issues. *Schuler v. State*, 112 N.E.3d 180, 186 (Ind. 2018). We do not reweigh evidence, and we will affirm if there is substantial evidence of probative value in the record supporting the trial court's decision. *Id.*

Hanning renews her argument that Deputy Akers conducted a search of her property on October 12 and that because he did not have a warrant authorizing him to conduct a search, the evidence he obtained that day (his observations and the photographs) must be suppressed. She acknowledges that Deputy Akers was permitted to drive down her driveway, walk the normal path to her door, and knock, keeping his eyes open along the way. Such activity generally does not constitute a "search." *See Florida v. Jardines*, 569 U.S. 1, 8 (2013). However, she asserts that Deputy Akers went beyond that permitted activity and illegally walked through and took photographs from the curtilage of her home. *See id.* at 7 ("While law enforcement officers need not shield their eyes when passing by the home on public thoroughfares, an officer's leave to gather information is sharply circumscribed when he steps off those thoroughfares and enters the Fourth Amendment's protected areas." (Citation omitted)).

Hanning had the burden of establishing that a search occurred, i.e., that Deputy Akers intruded upon a place where Hanning had a legitimate expectation of privacy. *See Brown v. State*, 691 N.E.2d 438, 443 (Ind. 1998); *see also Florida v. Riley*, 488 U.S. 445, 455 (1989) (O'Connor, J., concurring).

[14] Hanning claims that after Deputy Akers received no response to his knocking, he "walked over" her property, Appellant's Br. p. 11, walked "all around" her property, *id.*, "walked around the property," *id.* at 15, "trampled all over" her property, *id.* at 16, and walked "all over the property and curtilage," *id.* at 16-17. The problem with Hanning's argument is that she fails to direct us to any evidence that supports these claims. In fact, there is not a single citation to the record in the argument section of Hanning's opening brief, in violation of Appellate Rule 46(A)(8)(a) ("Each contention must be supported by citations to . . . the Appendix or parts of the Record on Appeal relied on[.]").

[15] In her statement of facts, Hanning asserts that Deputy Akers "walked around and photographed 'the entire property.'" *Id.* at 6. In support of this assertion, Hanning cites Deputy Akers's testimony at the warrant hearing. At that hearing, Deputy Akers testified that he "tried to make contact with [Hanning] and she wouldn't answer the door for me," Tr. Vol. III p. 46, and that he took "a look around the property," *id.* However, he did not testify that he "walked around" or "all around" or "all over" the property.

[16] It is true that Deputy Akers said he took photos of "the entire property[.]" *Id.* at 49. Taken literally, that would mean that he necessarily left the normal route of

access and entered Hanning's curtilage. On the other hand, if a person stood in the middle of a piece of property and took photos while turning in a circle, it could fairly be said that he took photos of "the entire property." Here, the record makes clear that Deputy Akers referred to "the entire property" in this general sense, not the literal sense. For example, one of the photos in the record shows two sides—but only two sides—of a large blue garage. *Id.* at 36. Similarly, there are photos of two sides of a mobile home and two sides of a camper. *Id.* at 12, 18, 20, 21, 22. If Deputy Akers had actually taken photos of "the entire property," we would have photos of all sides of the two buildings and the camper. Deputy Akers's statement that he took photos of "the entire property"—standing alone—does not support Hanning's claim that Deputy Akers walked "all over" or "all around" the property.

[17] In her reply brief, Hanning notes that Deputy Akers testified at the suppression hearing that he walked "[f]ive or six steps from the drive" to take a photo of the dog that was penned up outside. Tr. Vol. II p. 21. However, she does **not** argue that Deputy Akers violated her constitutional rights by taking those five or six steps. Instead, she contends that the photos in the record "clearly show" that Deputy Akers went **more** than five or six steps off the normal route of access. Appellant's Reply Br. pp. 6-7. Having reviewed the photos, we have to disagree. Many of the photos were plainly taken from the driveway and from the path(s) leading to Hanning's doors—areas Hanning concedes Deputy Akers was allowed to go. As for the other photos, we cannot tell whether Deputy Akers went onto Hanning's curtilage to take any of them; he might have, he

might not have. It is certainly not "clear" that he did, as Hanning suggests. As such, a conclusion that Deputy Akers entered the curtilage of Hanning's home would be based on speculation, not evidence. Hanning has failed to convince us that she is entitled to suppression of the evidence obtained on October 12.

[18] For the same reasons, we reject Hanning's argument that the search warrant was invalid and that the evidence obtained during the execution of the warrant must therefore be suppressed. That argument proceeds as follows: (1) Deputy Akers acted unconstitutionally when he visited Hanning's property on October 12; (2) Judge Stengel therefore should have disregarded Deputy Akers's photos and his testimony about that visit; and (3) the remaining evidence presented at the warrant hearing—Deputy Akers's testimony about the calls from Cox and Johnson, the eight prior neglect reports, and the Petfinder listing—was insufficient to support the issuance of the warrant. Because Hanning has not directed us to any evidence that Deputy Akers acted unconstitutionally during that first visit (i.e., that Deputy Akers entered her curtilage), her argument fails from the outset.

[19] But even if we were to assume that Deputy Akers entered Hanning's curtilage at some point on October 12, that does not mean all his observations and photographs from that visit would have to be disregarded. Again, Hanning does not dispute that Deputy Akers was entitled to come onto her property and knock on her door. Just doing that, Deputy Akers learned several things: (1) the property was littered with trash, animal carriers, and other items, *see* Tr. Vol. III pp. 14, 15, 25, 26, 27, 28, 29, 30, 34, 37 (photos taken from the

driveway and the path to the door); (2) there was a white Toyota van on the property, matching the description of the kitten-delivery vehicle given by at least one of the callers, *see id.* at 27 (photo) and 46 (testimony); and (3) there were at least two animals present on the property (one dog inside, one dog outside), *see id.* at 11 (photo of dog outside) and 47, 49 (testimony). This information, along with the calls from Cox and Johnson, the eight prior reports, and the Petfinder listing, more than justify the issuance of a search warrant.

[20] Affirmed.

Kirsch, J., and Altice, J., concur.