

IN THE

# Court of Appeals of Indiana

Elliahs Lamar Dorsey,

*Appellant/Cross-Appellee/Defendant*



FILED

May 14 2025, 9:20 am

CLERK
Indiana Supreme Court
Court of Appeals
and Tax Court

v.

State of Indiana,

*Appellee/Cross-Appellant/Plaintiff*

---

May 14, 2025

Court of Appeals Case No.
24A-CR-1056

Appeal from the Marion Superior Court

The Honorable Mark D. Stoner, Judge

Trial Court Cause No.
49D32-2004-MR-13622

---

**Opinion by Judge Bradford**

Judges Pyle and Kenworthy concur.

**Bradford, Judge.**

# Case Summary

[1]   In the first months of 2020, Elliahs Dorsey and Aisha Brown, who had known each other years before, became reacquainted and began to spend a great deal of time together and by early April were seeing each other nearly every day. On the morning of April 9, 2020, Dorsey, who had spent the night at Brown's apartment and was armed with a handgun and a shotgun, began acting strangely, expressing a belief that his family had died. Brown became increasingly concerned with Dorsey's behavior and eventually called 911. When four police officers arrived and knocked at the door, Dorsey prevented Brown from answering and fired several shots through the door, instantly killing Indianapolis Metropolitan Police Officer Breann Leath. When Brown fled the apartment, Dorsey fired at her several times, hitting her twice.

[2]   The State eventually charged Dorsey with murder, four counts of Level 1 felony attempted murder, and Level 3 felony criminal confinement. A jury found Dorsey guilty but mentally ill of Level 5 felony reckless homicide, Level 1 felony attempted murder of Brown, three counts of Level 6 felony criminal recklessness, and Level 3 felony criminal confinement. At Dorsey's sentencing hearing, the trial court reduced Dorsey's criminal-confinement from a Level 3 felony to a Level 6 felony due to double-jeopardy concerns and sentenced

Dorsey to forty-five years and 118 days of incarceration, with fifteen years suspended to probation. Dorsey contends that the State failed to produce sufficient evidence to sustain his convictions for criminal confinement and attempted murder of Brown, while, on cross-appeal, the State contends that the trial court erroneously reduced Dorsey's criminal-confinement conviction from a Level 3 felony to a Level 6 felony. Because we disagree with Dorsey and agree with the State, we affirm in part, reverse in part, and remand with instructions.

## Facts and Procedural History

[3] Brown met Dorsey through his brother when she was a junior in high school and became reacquainted with him in early 2020. Brown and Dorsey started seeing each other once or twice a week and then every day. In early February of 2020, Brown moved to an Indianapolis apartment, and Dorsey spent time there almost every day. On the evening of April 8, 2020, Dorsey went to Brown's apartment and stayed the night.

[4] The next morning, Brown, who was working from home, logged on to her computer between 10:00 and 10:30 a.m. Dorsey did not wake up until around 11:00 a.m., when he smoked marijuana with Brown. Dorsey went to the bathroom, and, when he came out, seemed "a little puzzled" and said that his family was dead. Tr. Vol. V p. 180. When Brown went to the kitchen to make something to eat, she noticed that Dorsey had picked up her Glock handgun; she took it away from him and put it in her bedroom closet. Dorsey was

already armed with two of his own firearms, including a handgun and a "baby shotgun[,]" which he carried by a strap around his neck. Tr. Vol. V p. 184.

[5] Brown tried to return to her work but was unable to because of distractions caused by Dorsey. Some of what Dorsey said made Brown believe that Dorsey thought that she was calling people to "come get him or something." Tr. Vol. V p. 186. Dorsey managed to find Brown's gun, and she "tussle[d]" with him to get it back a second time for about five minutes. Tr. Vol. V p. 188. Brown attempted to convince Dorsey to leave her apartment and called Dorsey's mother to help her, but she never came.

[6] Brown called 911 around 2:45 p.m. Officers Leath, Joseph Charles, Dillon Webb, and Charles Ward responded and walked up the stairs to Brown's apartment. Officer Charles stood to the right of the door, while Officer Leath stood to the left. Officer Charles knocked on the door but did not announce that it was the police. When Brown attempted to open the door, Dorsey pulled her back by the arm and began shooting through the door. Officer Leath was struck twice in the head and died instantly. Officers Webb, Charles, and Ward fled downstairs and outside.

[7] When Dorsey stopped firing through the door, Brown opened the door and started to run down the stairs. Dorsey fired at Brown, with the first shot hitting her on the right thigh and a second shot "fl[ying] in through [her] back." Tr. Vol. V p. 199. As a result of Brown's injuries, some of her intestines had to be removed and a portion of her bladder was affected. Brown would have to learn

how to walk again, and, four years later, her thigh was disformed, her ankle was swollen, and she was still experiencing daily pain in her thigh and knee.

[8] After his arrest, Dorsey told the police that he had thought someone was trying to kill him. According to Dorsey, he had insisted that Brown call 911, and when she had called them the first time, she had hung up and Dorsey had called them back. Dorsey claimed that when he had called either the police or his mother, Brown had turned on the vacuum cleaner. When officers had knocked on the door, Dorsey said that he had looked at Brown and said that she was trying to set them up and had started shooting through the door without looking to see who was at the door. Dorsey also acknowledged that he had shot Brown.

[9] On April 14, 2020, the State charged Dorsey with murder,[1] four counts of Level 1 felony attempted murder, Level 3 felony criminal confinement, and Class A misdemeanor battery. The State moved to dismiss the Class A misdemeanor battery count on February 6, 2024, which was granted the next day. On May 24, 2023, Dorsey requested permission to file a belated notice of insanity defense, which the trial court granted.

[10] Dorsey's jury trial began on February 12, 2024, and in his case-in-chief at trial, he presented a neuropsychologist's testimony that there were indications of an

---

[1] In 2021, the State requested the death penalty on the basis that Officer Leath had been acting in the course of her duty when killed. On January 24, 2024, the trial court granted the State's motion to dismiss the death penalty request.

untreated head injury in Dorsey's PET scan. Other experts diagnosed Dorsey with an acute or brief psychotic disorder at the time of the shooting, which is a psychotic episode that lasts no more than thirty days. The jury found Dorsey guilty but mentally ill of Level 5 felony reckless homicide, Level 1 felony attempted murder of Brown, three counts of Level 6 felony criminal recklessness, and Level 3 felony criminal confinement.

[11] At Dorsey's sentencing hearing, the State requested that the trial court sentence Dorsey to (1) six years of incarceration for the reckless homicide of Officer Leath, (2) forty years for the attempted murder of Brown, (3) fifteen years for the criminal confinement of Brown, and (4) two years for each of his criminal-recklessness convictions. The State requested that, with the exception that Dorsey's three sentences for criminal recklessness be served concurrently with each other, all other sentences be served consecutively, for an aggregate sentence of sixty-three years of incarceration. The trial court, however, concluded that because Dorsey's criminal confinement of Brown had happened so near in time to the attempted murder, the two were almost factually indistinguishable and reduced the criminal confinement from a Level 3 felony to a Level 6 felony. The trial court sentenced Dorsey to 1943 days of incarceration for reckless homicide, forty years for attempted murder, and two-and-one-half years for each of his criminal-recklessness convictions and for criminal confinement. The trial court ordered that Dorsey's sentence for reckless homicide be served consecutively with his sentence for attempted murder and concurrently with his sentences for all other charges, for an

aggregate term of forty-five years and 118 days of incarceration, with fifteen years suspended to probation.

# Discussion and Decision

*Direct Appeal Issues*

## I. Sufficiency of the Evidence

[12]   Dorsey contends that the State failed to produce sufficient evidence to sustain his convictions for the criminal confinement and attempted murder of Brown. When reviewing the sufficiency of the evidence, we neither reweigh evidence nor reevaluate the credibility of witnesses. *Suggs v. State*, 51 N.E.3d 1190, 1193 (Ind. 2016). "All probative evidence, even where it might be conflicting, and the reasonable inferences to be drawn from that evidence are viewed in the light most favorable to the judgment of conviction." *C.S. v. State*, 8 N.E.3d 668, 679 (Ind. 2014). "[A]ppellate courts must affirm if the probative evidence and reasonable inferences drawn from that evidence *could* have allowed a reasonable trier of fact to find the defendant guilty beyond a reasonable doubt." *Drane v. State*, 867 N.E.2d 144, 147 n.4 (Ind. 2007) (citation and quotation marks omitted; emphasis in original). We will not "divide and conquer the evidence by interpreting each piece individually in the defendant's favor, rather than considering the composite picture and drawing reasonable inferences in support of the verdict." *Young v. State*, 198 N.E.3d 1172, 1179 (Ind. 2022). Reversal is warranted only if the defendant can show that no reasonable fact-finder could have found him guilty on the evidence in the record. *McAlpin v. State*, 80 N.E.3d 157, 161 (Ind. 2017).

### A. Criminal Confinement

"A person who knowingly or intentionally confines another person without the other person's consent" while armed with a deadly weapon commits Level 3 felony criminal confinement. Ind. Code § 35-42-3-3(a), -3(b)(3)(A). "'[C]onfine' means to substantially interfere with the liberty of a person." Ind. Code § 35-42-3-1. "[C]onfinement exists when there is a substantial interference with liberty without consent, and [] any amount of force can cause a confinement because force, however brief, equals confinement." *Merriweather v. State*, 778 N.E.2d 449, 456 (Ind. Ct. App. 2002).

We have little hesitation in concluding that the State produced sufficient evidence to establish that Dorsey substantially interfered with Brown's liberty, however brief that interference may have been. When Brown tried to open her door for the officers who had responded to her 911 call, Dorsey, who was standing behind her, grabbed her arm and pulled her back. This is sufficient to establish criminal confinement. Dorsey seems to argue that the State failed to establish that Brown was confined without her consent, pointing out that Brown never testified that she had not felt free to leave her apartment. Brown, however, testified that she had "tried to go open the door" but had been prevented by Dorsey's use of force to pull her back. Tr. Vol. V p. 194. This is sufficient to support a finding that the confinement was without Brown's consent. Dorsey also seems to suggest that there might have been jury confusion about which act the jury might have found to have constituted criminal confinement, while, at the same time, seemingly conceding that he committed multiple acts that could have been found to constitute criminal

confinement. Even assuming such confusion could give rise to a viable claim on appeal, Dorsey fails to cite to any authority for that proposition and has therefore failed to make a cogent argument in this regard. *See* Ind. Appellate Rule 46(A)(8).

### B. Attempted Murder

A person who knowingly or intentionally kills another human being commits murder. Ind. Code § 35-42-1-1(1). A person attempts to commit a crime when that person engages in conduct that constitutes a substantial step toward the commission of the crime. Ind. Code § 35-41-5-1(a). "[F]or a person to be convicted of attempted murder, 'the State must prove beyond a reasonable doubt that the defendant [acted] with intent to kill the victim.'" *Gary v. State*, 124 N.E.3d 90, 93 (Ind. Ct. App. 2019) (quoting *Spradlin v. State*, 569 N.E.2d 948, 950 (Ind. 1991)) (brackets in *Gary*).

The jury reasonably concluded that Dorsey had acted with the specific intent to kill Brown when he had shot her twice. "Intent to kill may be inferred from the intentional use of a deadly weapon in a manner likely to cause death or great bodily injury." *Schuler v. State*, 112 N.E.3d 180, 188 (Ind. 2018). Moreover, "discharging a weapon in the direction of a victim is substantial evidence from which the jury could infer intent to kill." *Corbin v. State*, 840 N.E.2d 424, 429 (Ind. Ct. App. 2006). The jury was entitled to infer that Dorsey had had the specific intent to kill Brown because he had shot her twice.

The circumstances surrounding the shooting also support the jury's determination. "Intent to kill may be inferred from the nature of the attack and

circumstances surrounding the crime." *Perez v. State*, 872 N.E.2d 208, 214 (Ind. Ct. App. 2007), *trans. denied*. Here, just after Dorsey had shot and killed a police officer, he twice shot the only eyewitness to the killing. The jury could have reasonably concluded that Dorsey had attempted to kill Brown because she could have been a witness against him.

[18] This case is unlike *Patton v. State*, 810 N.E.2d 690 (Ind. 2004), to which Dorsey cites. In *Patton*, the defendant had pled guilty to attempted murder but had not been advised beforehand that to be found guilty of attempted murder he had to have had the specific intent to kill. *Id.* at 698. Moreover, the *Patton* Court concluded that there was no evidence that the defendant had acknowledged "shooting at" the victim or even knowing that the victim had been in the vehicle when he had shot at it. *Id.* at 699. This case is distinguishable because, at the very least, Dorsey had been aware that Brown was on the stairs and acknowledged shooting her.

[19] Dorsey argues there was insufficient evidence of a specific intent to kill because he had bullets left that he could have used to kill Brown and there might have been other reasons he had shot her. Dorsey's claims about his true intent when he shot Brown twice and his suppositions about what else he could have been trying to accomplish amount to nothing more than invitations to reweigh the evidence, which we will not do. *See Drane*, 867 N.E.2d at 146 (it is the role of the fact-finder to weigh the evidence). The State produced sufficient evidence to sustain Dorsey's convictions for criminal confinement and attempted murder.

*Cross-Appeal Issue*

## II.   Double Jeopardy

[20]   The State contends that the trial court's reduction of Dorsey's criminal-confinement conviction from a Level 3 felony to a Level 6 felony was erroneous.  Whether convictions violate Indiana's prohibitions against double jeopardy is a question of law reviewed *de novo*.  *Wadle v. State*, 151 N.E.3d 227, 237 (Ind. 2020) (citing *A.M. v. State*, 134 N.E.3d 361, 364 (Ind. 2019)).  Because substantive double jeopardy claims pose a pure question of law, we and the Indiana Supreme Court have routinely affirmed the State's ability to appeal a trial court's order declining to enter a judgment of conviction when the trial court's decision contravenes double jeopardy principles.  *See, e.g.*, *Kendall v. State*, 849 N.E.2d 1109, 1110 (Ind. 2006) (allowing the State's cross-appeal claiming the trial court had erred by vacating two of defendant's convictions on double-jeopardy grounds).  In any event, Dorsey does not contest the State's ability to raise this issue on cross-appeal.

[21]   Substantive claims of double jeopardy come in two principal varieties:  "(1) when a single criminal act or transaction violates a single statute but harms multiple victims, and (2) when a single criminal act or transaction violates multiple statutes with common elements and harms one or more victims."  *Wadle*, 151 N.E.3d at 247.  The Indiana Supreme Court's opinion in *Powell v. State*, 151 N.E.3d 256 (Ind. 2020), governs the first scenario while *Wadle* governs the second.  *Id*.  Because the two convictions at issue are defined by

distinct statutory provisions, the question of whether they violate prohibitions against double jeopardy is governed by *Wadle*.

[22] The first step in the *Wadle* analysis is to determine whether the language defining either offense clearly permits multiple punishments. *Id*. at 248. If the language is not clear, the next step is to apply the included-offense statute. *Id*. If neither offense is an included offense of the other, there is no double jeopardy violation. *Id*. The third and final step, if necessary, is to look at the underlying facts "as presented in the charging instrument and as adduced at trial" to determine "whether the defendant's actions were 'so compressed in terms of time, place, singleness of purpose, and continuity of action as to constitute a single transaction.'" *Id*. at 249 (quoting *Walker v. State*, 932 N.E.2d 733, 735 (Ind. Ct. App. 2010)).

[23] While there is a lack of explicit statutory language in either relevant offense allowing for multiple punishments, the State argues that multiple punishments are implicitly allowed. We choose not to address this first-step argument on its merits, however, due to the lack of explicit statutory language and because the State's claim succeeds at the second step of the *Wadle* analysis in any event. In that second step, we apply the provisions of Indiana Code section 35-31.5-2-168 to determine if either offense is inherently included in the other. *Wadle*, 151 N.E.3d at 248. A particular charged offense is inherently included in another if it

> (1) is established by proof of the same material elements or less than all the material elements required to establish the commission of the offense charged;

(2) consists of an attempt to commit the offense charged or an offense otherwise included therein; or

(3) differs from the offense charged only in the respect that a less serious harm or risk of harm to the same person, property, or public interest, or a lesser kind of culpability is required to establish its commission.

Ind. Code § 35-31.5-2-168. Neither attempted murder nor Level 3 felony criminal confinement is inherently included in the other because each offense requires proof that the other does not. For attempted murder, the State had to show that Dorsey had shot Brown with the specific intent to kill her, which is not an element of criminal confinement. For criminal confinement, the State had to prove that Dorsey had substantially interfered with Brown's liberty, which is not an element of attempted murder.

[24] The offenses are also not factually included based on the charging information. The Indiana Supreme Court has recently clarified that, in determining whether offenses are factually included in one another, we are not permitted to examine evidence adduced at trial, *only* the facts presented in the charging instrument. *A.W. v. State*, 229 N.E.3d 1060, 1068–69 (Ind. 2024). The charging information for attempted murder provides as follows:

> On or about April 9, 2020, Elliahs Lamar Dorsey did attempt to commit the crime of Murder, which is to knowingly or intentionally kill another human being, namely: Aisha Brown, by engaging in conduct, that is: shooting a firearm at and against Aisha Brown with the specific intent to kill Aisha Brown, which conduct constituted a substantial step toward the commission of said crime of Murder[.]

Appellant's App. Vol. II p. 62. For the charge of criminal confinement, the charging information reads: "On or about April 9, 2020, Elliahs Lamar Dorsey did knowingly or intentionally confine Aisha Brown without the consent of Aisha Brown, said Elliahs Lamar Dorsey being armed with a deadly weapon, to wit: a firearm[.]" Appellant's App. Vol. II p. 63.

[25] For essentially the same reasons that neither of these offenses is inherently included in the other, the facts alleged in the charging information make it clear that neither the attempted murder nor the criminal confinement is factually included in the other. Simply put, as alleged, the means used to commit the attempted murder do not satisfy all of the elements of the criminal confinement, and vice versa. Consequently, our analysis ends here, in step two of the *Wadle* analysis, with the conclusion that there is no double jeopardy violation. *See A.W.*, 229 N.E.3d at 1068 ("[I]f Step 2 is **not** met, the analysis **ends**."). We reverse the trial court's entry of judgment of conviction for Level 6 felony criminal confinement and remand for the entry of judgment of conviction for Level 3 felony criminal confinement.

[26] We affirm the judgment of the trial court in part, reverse in part, and remand for entry of judgment of conviction for Level 3 felony criminal confinement and sentencing for that conviction, including determining how that sentence should be run in relation to Dorsey's other sentences.

Pyle, J., and Kenworthy, J., concur.

ATTORNEY FOR APPELLANT

Ann M. Sutton
Marion County Public Defender Agency
Appellate Division
Indianapolis, Indiana

ATTORNEYS FOR APPELLEE

Theodore E. Rokita
Indiana Attorney General

Caroline G. Templeton
Supervising Deputy Attorney General
Indianapolis, Indiana