**UNITED STATES of America, Plaintiff-Appellee,**

v.

**William WALKER, Defendant-Appellant.**

**No. 80–1202.**

United States Court of Appeals, Seventh Circuit.

Argued Oct. 23, 1980.

Decided June 29, 1981.

Patrick G. Reardon, Chicago, Ill., for defendant-appellant.

Joseph H. Hartzler, Asst. U. S. Atty., Chicago, Ill., for plaintiff-appellee.

Before SWYGERT, PELL and CUDAHY, Circuit Judges.

PELL, Circuit Judge.

Defendant-appellant William Walker appeals from his conviction of extortion under color of official right in violation of the Hobbs Act, 18 U.S.C. § 1951.[1] Walker's first trial in November 1979 resulted in a deadlocked jury and was declared a mistrial. A second jury found Walker guilty in December 1979. He was sentenced to six months imprisonment and placed on a three year probation term.

## I.

William Walker has been employed by the Chicago Fire Department as a firefighter since 1973. Walker's duties as a firefighter did not include individual inspections of residential units. The Government sought to prove that Walker wrongfully used his position as a firefighter to extort $150 from Arthur Nichols, an individual who owned several apartment buildings in Chicago. Nichols testified that Walker, in uniform, came to Nichols' home in June, 1979 and introduced himself as a fire inspector. Nichols testified that Walker said he had just visited a building owned and managed by Nichols which Walker termed to be "in terrible shape." Walker allegedly warned that Nichols would have to take some action regarding the building, but that Walker would approve the building if Nichols gave him "a couple of hundred dollars." While testifying at his first trial, Walker denied that this meeting ever occurred. Nichols' testimony regarding this meeting was uncorroborated.

In its brief on appeal, the Government represents that Nichols' testimony that Walker claimed to be a fire inspector was "corroborated by the testimony of four of Nichols' tenants who stated that on separate occasions Walker identified himself to them as a fire inspector." A cursory examination of the record, however, indicates

that the Government has seriously mischaracterized the facts. Four witnesses stated that someone representing himself as a fire inspector had visited their homes, but three of the four could not at trial identify the defendant as that individual. One of the three stated that the individual who visited her did so in August, while Walker's visits allegedly occurred before July 7th, the date of Walker's meeting with Nichols. Contrary to the Government's representation, only one of the Government's witnesses identified the defendant in court as an individual who had visited her apartment and had identified himself as a fire inspector. Even she, however, could not remember when he had visited. Three Government witnesses testified that no one claiming to be a fire inspector had ever visited their apartments.

Nichols testified that he called the Federal Bureau of Investigation (FBI) and arranged to have himself wired with a microphone and voice recorder for a subsequent meeting with Walker. FBI agents waited in Nichols' apartment on July 2, 1979, but Walker did not appear. On July 7, FBI agents again came to Nichols' apartment and wired Nichols with a microphone and tape recorder. The agents hid in a bedroom where they were able to monitor Nichols' conversation with Walker who arrived shortly thereafter.

The tape of the conversation and the testimonies of Agent Kosky and Nichols regarding the conversation were admitted at trial. The evidence is in a state of conflict as to exactly what occurred when Nichols passed the $150 to Walker. It is undisputed that Nichols took the $150 from his pocket, counted it out, and directed Walker to count it himself. Nichols testified that Walker said it would be unnecessary to count it again since Walker had

---

1. 18 U.S.C. § 1951(a) provides, in pertinent part,

    Whoever in any way or degree obstructs, delays, or affects commerce or the movement of any article or commodity in commerce, by robbery or extortion or attempts or conspires so to do, ... shall be fined not more than

$10,000 or imprisoned not more than twenty years, or both.

18 U.S.C. § 1951(b)(2) defines "extortion" as "the obtaining of property from another, with his consent, induced by wrongful use of actual or threatened force, violence, or fear, or under color of official right."

already counted it with Nichols. Agent Kosky, however, testified that Walker never said those words. Nowhere in the taped conversation does such a response by Walker appear. While the conversation does contain some references to splitting payoff money with supervisors and a request and assurances that Nichols would not be "hustled" by anyone, the tape contains no request for, or acknowledgment of, money by Walker.

Nichols testified that Walker had pocketed the money, but then took it out and placed it on a table. Walker said he had never put the money in his pocket, but instead had gestured to indicate that he did not want the money. He testified at the first trial that he took the money from Nichols and threw it in an ashtray on a table where it was subsequently discovered by the FBI agents. The taped recording and Agent Kosky's testimony demonstrated that just before the agents entered the room to arrest Walker, Nichols had whispered to them not to come into the room yet because Walker "hasn't put it [the money] in his pocket *yet. . . .*" (Emphasis added.)

Agent Kosky testified that when Walker was arrested, he told FBI agents that he was not attempting to extort money from Nichols, but that he had talked to Nichols because of a friend named Robert Wilson whose mother had recently moved from Nichols' building. Agent Kosky, however, stated that he had been unable to locate Robert Wilson at the address Walker had given.

Walker elected not to testify at the second trial. Portions of his testimony from the first trial, however, were admitted into evidence at the second trial including Walker's testimony that he had originally talked to Nichols on behalf of Walker's girlfriend, Marcella Wilson, who allegedly lived in Nichols' building and had been threatened with eviction by Nichols for failure to pay rent. Several persons who had been tenants of the building in June and July of 1979 testified at the second trial that they did not know of anyone named Marcella Wilson.

On appeal, Walker argues, *inter alia*, that the trial judge erred by allowing the Government to introduce selected portions of the defendant's prior testimony while refusing to admit other relevant parts in violation of Fed.R.Evid. 106. Because we agree that the trial court committed reversible error by precluding the admission of portions of the prior testimony, we find it unnecessary to address the defendant's other allegations of error other than the contention that the evidence was insufficient to prove guilt beyond a reasonable doubt, which contention we hold to be without merit.

## II.

Federal Rule of Evidence 106 codifies the common law rule of completeness:[2]

> When a writing or recorded statement or part thereof is introduced by a party, an adverse party may require him at that time to introduce any other part or any other writing or recorded statement which ought in fairness to be considered contemporaneously with it.

This rule is circumscribed by two qualifications. The portions sought to be admitted (1) must be relevant to the issues and (2) only those parts which qualify or explain the subject matter of the portion offered by the opponent need be admitted. *United States v. McCorkle*, 511 F.2d 482, 486–87 (7th Cir.), *cert. denied*, 423 U.S. 826, 96 S.Ct. 43, 46 L.Ed.2d 43 (1975).

At Walker's second trial, the Government introduced fourteen pages of Walker's direct testimony and a short excerpt of his cross-examination from the first trial at which he had chosen to testify. Defense counsel seasonably objected to this meristic treatment and requested the contemporaneous admission of the entire twenty-eight

---

**2.** Rule 106 deviates from the common law rule only in the respect that the party seeking admission under the rule is now entitled to compel the admission at the time the opposing party offers the partial evidence instead of waiting until a later stage of trial. S. Saltzburg & K. Redden, Federal Rules of Evidence Manual 55 (2d ed. 1977).

pages of Walker's testimony, or at least the remaining five pages of his direct testimony.

The admitted testimony recounted Walker's prior explanation of his visit to Nichols which he described as motivated not by an extortionate plan, but by personal reasons relating to his girlfriend, Marcella Wilson. Some of the testimony related specifically to the events which transpired during the July 7th meeting including Walker's statement that although Nichols had counted out the money for him, Walker had refused it by gesturing, throwing the money into an ashtray, and exclaiming "Huh-uh." [3]

We find that the excluded testimony satisfies the standard enunciated in *United States v. McCorkle, supra,* because substantial portions were both relevant to specific elements of the Government's proof [4] and explanatory of the excerpts already admitted. For instance, some of the excluded testimony probed Walker's intent and developed his allegation that his participation in the July 7th meeting was innocent:

Q: When you went to that apartment on July 7th on Saturday morning, did you expect to be given any money?

A: No, sir.

Q: Did you know what it was for when Nichols pulled it out?

A: I didn't know just when he pulled it out, but I am not crazy, you know. When he started talking about, you know, about bribes and stuff like that and cracking the money, you know, I had a feeling. But, like I say, I didn't go over there, you know, to collect no money. I went over there because I just didn't want to see them people get put out in the street, see.

*   *   *   *   *   *

Q: You did not know why the money was being pulled out. I believe that was your testimony?

A: No.

Q: You did not ask him why he was handing you this money, did you?

A: No, because I knew I wasn't going to take it. Nowhere in the world I was going to take that money.

This testimony satisfies the first prong of the *McCorkle* test because it relates to the issue of whether Nichols produced the money in response to an extortionate demand by Walker or whether Nichols initiated the bribe which Walker allegedly rejected. The testimony also fulfills the second *McCorkle* requirement by explaining Walker's already admitted statements that he had visited Nichols for personal reasons and that Nichols himself had initiated the bribe by tendering money which Walker rejected.

Another example of improperly excluded testimony related to the contested issue of whether Walker at any time accepted the money. Nichols contended that Walker did pocket the $150 at one point, but then put it on a table. Walker's denial that he ever pocketed the money buttresses his claim that he never attempted to extort money from Nichols. The act of leaving bribe money in plain sight would not seem to support a kleptic purpose or to be consistent with guilt, as the Government conceded in

---

**3.** The transcript of the tape records the exclamation as "So .... ahh." Agent Kosky testified that this utterance is "what I think I heard." Nichols testified that Walker had responded that he did not have to count the money because "I counted it along with you." Kosky, however, as noted previously, testified that those words "did not take place."

**4.** This case contrasts with *McCorkle, supra,* in which this court found that testimony regarding the defendant's reasons for failing to file income tax returns simply was not relevant to the issue of "whether McCorkle intentionally failed to file returns knowing that he was legally obligated to do so" because intent to defraud the government is not required to establish the necessary willfulness for conviction of willful failure to file federal income tax returns. 511 F.2d at 487.

The present case is also distinguishable from *United States v. Littwin,* 338 F.2d 141, 146 (8th Cir. 1964), *cert. denied,* 380 U.S. 911, 85 S.Ct. 896, 13 L.Ed.2d 797 (1965), cited by the Government, because the defendant in *Littwin* did not specify, even on appeal, what portions of a three hour taped recording would have been relevant and explanatory. In the case at bar, the defendant has specifically referred us to portions of the testimony which qualify under the *McCorkle* standard.

oral argument, especially in view of the fact that during the July 7th conversation the parties were repeatedly interrupted by Nichols' tenants. Although admitted testimony did indicate that Walker initially threw the money in an ashtray, the trial court excluded other testimony in which Walker explained at length that the money was *never* in his pocket:

Q: When you folded the money and threw it in the ashtray, that was right at the time he was counting it out? Right after, at that moment?

A: Yes.

Q: At any time during the time that you were in that apartment, did you ever put that money in your pocket?

A: No, sir.

Q: Not at all?

A: No, sir.

Q: Where did that money stay or go during the time that you were in the apartment after you saw it?

A: That money laid right there in the ashtray, sir.

Q: Now later on some other men came in the apartment? Some FBI men?

A: Oh, yes.

Q: At the time those FBI men came into the apartment, where was the money that Nichols had pulled out and counted?

A: It was still in the ashtray.

Q: At that time, had it ever been anywhere else between the time you put it there and when you got arrested?

A: No, sir.

Q: It was in the ashtray the whole time?

A: Yes, sir.

Q: You never put it in your pocket during any of that period?

A: No, sir.

The admitted testimony also contained Walker's contention that he only visited Nichols to prevent his girlfriend from being evicted. During direct examination, defense counsel turned Walker's attention to the taped conversation and inquired whether Walker had asked Nichols for money during the meeting. Walker responded negatively and asserted that Nichols initiated the discussion about bribe money. These representations might seem incredible, particularly in view of the ambiguous contents of the taped conversation already admitted into evidence, without Walker's interpretation of the context in which bribery was discussed.[5] Walker's testimony on this subject included:

Q. What, if anything, did you say to Nichols that you can remember when he asked you about his own self being hustled?

A: Well, I told him—you see, what the deal was, I went over to convince him of getting the place fixed up and, you know, collecting the rent; but I went over there, you see, really to try to back up my girlfriend and her family. Now when he come over and talked about being—you said—repeat that again.

Q: Did he ask you something about himself being hustled or what he should do if he was hustled?

A: I told him if anybody come by there, you know, to tell them that I knew him; because I been with the Fire Department for quite awhile and I know a lot of people.

Q: What did you think that would accomplish?

A: That if they came by there, if they did come by to try to bribe him, he would say "Well, I know Fire Fighter Walker," and they say "Okay. Well, just fix up your place, and I will be back within two or three months and check it out."

Q: Now Nichols asked you about whether bribes were being taken in the Fire Department, did he not, by inspectors and stuff. Do you remember that part of the conversation?

A: Yes, sir.

Q: Who brought up the subject? Did Nichols bring that up or did you?

---

**5.** This excluded testimony satisfied the first prong of *McCorkle* as well because it was relevant to Walker's motive for visiting Nichols and offered another explanation for the potentially incriminating tone of the July 7th conversation.

A:  No, no, he brought it up.

Q:  Did you talk with him about that?

A:  Yes.

Q:  Why did you talk with him about that?

A:  I talked with him, just what I had read in the paper and heard just gossip around—you know, around the Department.

Q:  Did you know why he was asking you those questions?

A:  No, I had no idea.

Finally, the admitted testimony established that Walker had visited Nichols' building in uniform a few times and that he had on occasion spoken with tenants regarding eviction. The trial court excluded Walker's assertion that he was not in uniform when he first met Nichols. The court also excluded further testimony bearing upon the nature of Walker's contacts with Nichols' tenants. Both excerpts related to whether the extortion charged occurred under color of official right as required by the statute. Secondly, both parts further explained statements already admitted into evidence. The testimony regarding the tenants explained the specific nature of Walker's discussion regarding eviction with one of the tenants and included his denial that he had talked to other tenants. Walker's assertion that he was not in uniform at the July 7th meeting, moreover, counter-balanced his admitted testimony that he identified himself as a firefighter when he first contacted Nichols by telephone.

■ Because we find that most of Walker's excluded testimony did qualify for admission under Fed.R.Evid. 106, we must next determine whether the trial judge abused his discretion in nevertheless refusing admission.

The Advisory Committee's Note indicates that Rule 106 is primarily designed to affect the order of proof. "The rule is based on two considerations. The first is the misleading impression created by taking matters out of context. The second is the inadequacy of repair work when delayed to a point later in the trial." Fed.R.Evid. 106, Advisory Committee's Note. Consequently, the trial judge's exercise of discretion under the rule should involve the weighing of the adequacy of the "repair work" necessary to correct any potentially misleading impression caused by an incomplete presentation against "the waste of time and attention and the unfairness involved in blunting the proponent's presentation of his case when everything is required to be read at one time." 1 Weinstein's Evidence (1979) ¶ 106[01] at 106–7.

In criminal cases where the defendant elects not to testify, as in the present case, more is at stake than the order of proof. If the Government is not required to submit all relevant portions of prior testimony which further explain selected parts which the Government has offered, the excluded portions may never be admitted. Thus there may be no "repair work" which could remedy the unfairness of a selective presentation later in the trial of such a case. While certainly not as egregious, the situation at hand does bear similarity to "[f]orcing the defendant to take the stand in order to introduce the omitted exculpatory portions of [a] confession [which] is a denial of his right against self-incrimination." *Id.* at 106–9. The admitted testimony in this case cannot properly be characterized as a confession. It contains no admission of guilt and, since most of the admitted testimony was excerpted from Walker's direct examination, it naturally contains statements favorable to Walker. Nonetheless, the Government's incomplete presentation may have painted a distorted picture of Walker's prior testimony which he was powerless to remedy without taking the stand.[6]

The Government would not have been confronted with a situation of operosity had

---

**6.** At trial, the defense initially sought to admit the testimony under Rule 106. When it became apparent that this would not be permitted, the defendant's attorneys next suggested that the Government admit its excerpts through the court reporter who had transcribed the testimony so that the balance of Walker's testimony could be admitted on cross-examination. The court, however, warned that

Now whether you want to put on them [the Government] the burden of calling Mr. Giles, that is entirely up to you; but the fact that

it been compelled to read the balance of the transcript. Walker's entire testimony constituted only twenty-eight pages. The Government read approximately fourteen of these pages into evidence. Forcing the Government to include the remainder would not have seriously disrupted the prosecution's case. Most importantly, it is axiomatic that the Government has a duty to conduct a fair trial. As this court admonished in oral argument, the Government's efforts to execute this obligation should be at least as active as its zeal to secure convictions.

The potential unfairness to the defendant, by contrast, was substantial. Because Walker chose not to testify at the second trial, the Government's selective presentation of his prior testimony resulted in the total exclusion of Walker's testimony explaining the parts admitted, not just a delay in the introduction of the remaining parts. This result penalizes Walker for failing to testify at his second trial.

Any inconvenience to the court caused by the introduction of the remaining testimony would have been minimal. At trial, the Government attorneys read the selected portions to the jury with one attorney assuming the role of the defendant and the other taking the part of the examiner. The additional time necessary for them to have read the remaining pages would have been inconsequential. In view of the weighty factors favoring admissibility, which are not counterbalanced by any plausible reasons for exclusion, we find that the trial judge committed error in excluding the relevant and explanatory portions of Walker's prior testimony.[7]

We cannot say that the error was harmless in this case.[8] An error is harmless only "[i]f we are convinced that 'the error did not influence the jury, or had but very slight effect,' and can say 'with fair assurance, after pondering all that happened without stripping the erroneous action from the whole, that the judgment was not substantially swayed by the error.'" *United States v. Shepherd*, 576 F.2d 719, 723–24 (7th Cir.), *cert. denied*, 439 U.S. 852, 99 S.Ct. 158, 58 L.Ed.2d 155 (1978), quoting *Kotteakos v. United States*, 328 U.S. 750, 764–65, 66 S.Ct. 1239, 1247–48, 90 L.Ed. 1557 (1946).

A reviewing court does not focus upon whether the defendant was in fact guilty in determining whether trial error was harmless. *United States v. Shepherd, supra*, 576 F.2d at 723. Yet evidence of guilt is relevant because overwhelming evidence of guilt may reduce the possibility that the verdict was seriously affected by trial error. *Id.* at 725–27. Walker's first trial ended in a mistrial because the jurors were unable to reach a unanimous verdict.[9] While the evidence of guilt presented at the second trial was not lacking, neither was it overwhelming.

you put them to that burden does not in any way open the door for having Mr. Giles read the entire transcript. I would not permit that.

7. The Government correctly points out that general testimony regarding Walker's background is not admissible under Rule 106. We agree and note that this reversal does not relate to irrelevant information such as that contained in the first two pages of Walker's testimony.

8. Fed.R.Crim.P. 52(a) provides that "[a]ny error, defect, irregularity or variance which does not affect substantial rights shall be disregarded."

9. We recognize that the evidence presented at each trial did not wholly overlap. At the second trial the Government introduced Walker's prior testimony so that it could expose, and refute with witnesses, Walker's contention at the first trial that a Marcella Wilson lived in Nichols' building. The prosecution had been unable to present witnesses to rebut this assertion at the first trial.

The first jury did hear Walker admit that he had not mentioned anyone named Wilson to Nichols during their meeting. This admission necessarily undermined Walker's version of events since he had testified that he visited Nichols only to help Marcella Wilson. At both trials, the Government showed that, when arrested, Walker had claimed that he visited Nichols on behalf of a Robert Wilson. The Government also established in both cases that no Robert Wilson lived at the address Walker had given Agent Kosky. This discrepancy apparently did not persuade all of the jurors in the first trial that Walker was guilty. While the added discrepancy in the second trial further undermined Walker's innocence, the fact

At the second trial, the testimony of Government witnesses frequently conflicted on crucial issues such as Walker's response when given the $150 and whether or not Walker ever pocketed the money. At the end of the trial, the judge complied with the jury's request to hear again the taped recording of the July 7th conversation accompanied by transcripts of that recording. The jurors had heard Walker's answers, from a "prior proceeding," to many questions regarding that ambiguous July 7th meeting, but were deprived of his further testimony which would have shed more light upon the defendant's interpretation of those events.

Because the evidence in this case is close and often conflicting, we cannot be assured that the error in excluding portions of Walker's prior testimony, which should in fairness have been admitted under Rule 106, had at most only a slight effect upon the jury. When "the Government's case involves close factual issues and its proof of an element of the crimes alleged leaves room for a reasonable inference inconsistent with guilt,[10] we will scrutinize claimed error with particular care. Error which may be deemed relatively minor in other circumstances may reach prejudicial proportions in a close factual case such as this." *United States v. Grunberger*, 431 F.2d 1062, 1066–67 (2d Cir. 1970) (footnote omitted). We are compelled to find that the error in this case was not harmless. The defendant's conviction is reversed and the case is remanded for further appropriate proceedings.

that the first jury, which heard Walker's entire testimony, was unable to reach a unanimous verdict is not totally devoid of significance.

**10.** Much of the Government's evidence, for example, tended to substantiate Walker's claim that he never pocketed the $150 during the July 7th meeting. As discussed above, the act of leaving such money in plain sight in spite of constant interruptions by third persons, coupled with the absence of any explicit statement on the tape to indicate that Walker clearly proposed or accepted the bribe, is inconsistent with an intent to extort. Thus, although other evidence might permit the opposite inference, we believe that the evidence as a whole would permit a reasonable inference inconsistent with guilt.