## MEMORANDUM DECISION

Pursuant to Ind. Appellate Rule 65(D), this Memorandum Decision shall not be regarded as precedent or cited before any court except for the purpose of establishing the defense of res judicata, collateral estoppel, or the law of the case.



**FILED**

Mar 30 2020, 9:49 am

**CLERK**
Indiana Supreme Court
Court of Appeals
and Tax Court

ATTORNEY FOR APPELLANT

Scott H. Duerring
South Bend, Indiana

ATTORNEYS FOR APPELLEE

Curtis T. Hill, Jr.
Attorney General of Indiana

George P. Sherman
Deputy Attorney General
Indianapolis, Indiana

# IN THE
# COURT OF APPEALS OF INDIANA

| | |
|---|---|
| Jesus Pedraza, Jr., <br> *Appellant-Defendant,* <br><br> v. <br><br> State of Indiana, <br> *Appellee-Plaintiff.* | March 30, 2020 <br><br> Court of Appeals Case No. 19A-CR-850 <br><br> Appeal from the St. Joseph Superior Court <br><br> The Honorable Elizabeth C. Hurley, Judge <br><br> Trial Court Cause No. 71D08-1709-MR-12 |

**Tavitas, Judge.**

# Case Summary

Jesus Pedraza, Jr., appeals his convictions, following a jury trial, for two counts of murder. We affirm.

# Issue

Pedraza raises four issues on appeal, which we consolidate and restate as whether the trial court's evidentiary rulings regarding the admission and exclusion of evidence violated Pedraza's substantial rights.

# Facts

In late July or early August 2017, Pedraza asked Jermon Gavin to facilitate a drug deal for a large quantity of methamphetamine. Gavin relayed Pedraza's request to Ronald Snyder, who contacted Joshua Sage. Sage agreed to sell 1.5 pounds of methamphetamine to Pedraza and his brother, Benito Pedraza ("Benito"), for $13,500.00. Snyder added a $500.00 fee for himself and relayed the terms to Gavin, who accepted on Pedraza's behalf.

In the late evening of August 2, 2017, Sage and his brother, Robert Brady, went to Snyder's house on Frederickson Street in St. Joseph County to complete the transaction. Sage and Brady were armed with "a couple [of] guns" when they joined Snyder, Alyssa Sanchez, and others in Snyder's house. Tr. Vol. III p. 88.

The drug buy was a ruse, and Pedraza intended to steal the methamphetamine from Sage. That same evening, Pedraza, Benito, Gavin, and Damon Bethel drove past Snyder's house in Benito's dark Chevy Impala. Each man was

armed with a gun, and Pedraza indicated that Snyder's house would be the site of the robbery. Benito circled the block and dropped Bethel off in a nearby alley that led to Frederickson Street. Pedraza instructed Bethel to approach Snyder's house on foot from the alley. Pedraza, Benito, and Gavin proceeded to Snyder's house. Gavin telephoned Snyder that he and Pedraza were outside the house. Snyder, Sage, Brady, Gavin, and Pedraza then met in Snyder's garage to complete the transaction. Benito remained in the Chevy Impala.

[6] Near the same time, Anton "Stoney" James parked his white SUV in front of Snyder's house. James was at Snyder's house to see Sanchez. James remained in the SUV, while Sanchez shuttled between the house and the SUV.

[7] Inside the house, Pedraza inspected the methamphetamine and left the garage, purportedly to get the $14,000.00 from the Chevy Impala. Pedraza telephoned Bethel and instructed Bethel to ambush Snyder's garage. After Pedraza was gone too long, Gavin telephoned Pedraza. Pedraza told Gavin: "I ain't going to lie, I need that sh**, I'm about to send [Bethel] in." Tr. Vol. IV p. 138.

[8] Bethel suddenly emerged, pointed his gun at the occupants of the garage, and demanded the methamphetamine. The occupants of the garage and Bethel

exchanged gunfire.[1] Gavin ran from the garage, fired his gun into the garage as he fled, and jumped into the back seat of the Chevy Impala.

[9] Sanchez was near or entering James' SUV when the gunfire erupted. James and Sanchez sped from the scene. Benito exited the Chevy Impala and fired multiple gunshots at James' SUV. Pedraza, Benito, and Gavin fled the scene without Bethel, who lay wounded in Snyder's garage.

[10] At 11:22 p.m., Officer Joshua Morgan of the South Bend Police Department heard "about twenty shots, gunfire coming from the south of [his] location." Tr. Vol. III p. 16. Dispatch directed Officer Morgan to Snyder's address. When Officer Morgan arrived, bystanders directed him to Snyder's garage. In Snyder's garage, Bethel lay face down with a gun near his hand. Bethel died soon thereafter. An unidentified person flagged down Officer Mollie O'Blenis of the South Bend Police Department and pointed out Sanchez, who was "laying [sic] face down unresponsive" in a driveway.[2] *Id*. at 36. James' SUV was crashed nearby, and James was dead inside the vehicle.

[11] Investigators processed the scene and recovered over two pounds of methamphetamine; in excess of fifty shell casings and bullets; handguns; and a cell phone from Bethel's person. Cell phone records revealed call activity

---

[1] Snyder was not in the garage when Bethel entered. Snyder was about to descend into his basement when he heard "somebody r[u]n in and say something"; Snyder began to walk toward the garage when he "started hearing gunfire and [ ] dropped to the ground." Tr. Vol. III p. 97.

[2] Sanchez survived her gunshot wound.

between Gavin, Snyder, Pedraza, and/or Bethel, as well as multiple calls to Bethel's cell phone after the shooting. Cell phone tower data placed Pedraza's phone in the vicinity of Frederickson Street when the murders were committed. The police recovered DNA evidence from the scene, including multiple DNA profiles on the handgun that was found near Bethel.

[12] Also, surveillance cameras captured the events that occurred outside Snyder's house during the robbery. The footage depicts the following events: Benito's Chevy Impala parks outside Snyder's house. Pedraza and Gavin exit the vehicle and walk up Snyder's driveway. Snyder emerges to greet them. Pedraza, Gavin, and Snyder enter the garage and remain inside; after a short time, Pedraza exits the garage and walks to Benito's car. Soon thereafter, Bethel runs into the garage with his gun drawn. Benito exits his car and shoots his gun, and Gavin runs from the garage and is also shooting his gun. Pedraza exits Benito's car and crouches behind it. *See* State's Exhibit 17; *see also* Tr. Vol. IV pp. 145-48. Additionally, Gavin cooperated with the police investigation, told investigators about the foregoing events, and led investigators to Benito's Chevy Impala, which had undergone fresh bodywork repairs.

[13] On September 12, 2017, the State charged Pedraza with two counts of murder and one count of attempted robbery, a Level 5 felony. The next day, Pedraza was arrested and interviewed by the police. Pedraza was tried by a jury on March 4, 2019. The State's evidence of Pedraza's guilt included: (1) surveillance footage placing Pedraza at Snyder's house on the night of the murders, despite Pedraza's claim that he was out of town when the murders

were committed; (2) surveillance footage that, consistently with Gavin's testimony, depicted Pedraza entering Snyder's garage and exiting moments before Bethel ran in with a gun; (3) Gavin's testimony that Pedraza orchestrated the robbery; (4) cell phone tower data placing Pedraza's phone in the vicinity of Frederickson Street at the time of the murders; and (5) other corroborating evidence.

[14] The jury found Pedraza guilty of two counts of murder and one count of attempted robbery, a Level 5 felony. On April 16, 2019, Pedraza was sentenced to concurrent sixty-year terms for the murders;[3] he now appeals. Additional facts will be provided below.

## Analysis

[15] Pedraza's arguments on appeal stem from the trial court's decisions to admit or exclude evidence. A trial court's ruling on the admission of evidence is generally accorded a great deal of deference on appeal. *Hall v. State*, 36 N.E.3d 459, 466 (Ind. 2015), *reh'g denied*. We do not reweigh the evidence; rather, we consider only evidence that is either favorable to the ruling or unrefuted and favorable to the defendant. *Beasley v. State*, 46 N.E.3d 1232, 1235 (Ind. 2016).

---

[3] The trial court did not enter judgment of conviction on Pedraza's conviction for attempted robbery, a Level 5 felony, which merged with his murder convictions.

[16] We will not reverse an error in the admission of evidence if the error was harmless. *Turner v. State*, 953 N.E.2d 1039, 1058 (Ind. 2011). Indiana Trial Rule 61 provides:

> No error in either the admission or the exclusion of evidence . . . is ground for . . . setting aside a verdict or for vacating, modifying or otherwise disturbing a judgment or order or for reversal on appeal, unless refusal to take such action appears to the court inconsistent with substantial justice. The court at every stage of the proceeding must disregard any error or defect in the proceeding which does not affect the substantial rights of the parties.

An improper admission is harmless if the conviction is supported by substantial independent evidence of guilt satisfying the reviewing court that there is no *Turner*, 953 N.E.2d at 1059.

### I. Pedraza's Statement

[17] Pedraza's first argument pertains to the admission of his redacted statement to the police. The following facts relate to these issues.

[18] At the outset of Pedraza's videotaped interview, Investigator Gery Mullins told Pedraza that Pedraza was in custody and was not free to leave.[4] Investigator Mullins read Pedraza his *Miranda* rights and gave Pedraza a written advisement and waiver that Pedraza signed. Investigator Mullins asked Pedraza: "Any

---

[4] The record reveals that an "Inspector Riley" was also present in the interview room.

idea why you'd be down here[?]"; "[i]t's got everything to do with Frederickson [Street] and Huey"; and "[w]e've got information that you were out there that night all this stuff happened." Tr. Exhibits Vol. p. 177, State's Ex. 129.[5] Multiple times, Pedraza asked Investigator Mullins to state the charges on which Pedraza was being detained. Pedraza denied any involvement and insisted that he was out of town when the murders were committed. Further, Pedraza stated that: (1) he was aware of what happened at Frederickson Street; (2) his friend, Bethel, died in the Frederickson Street incident; and (3) Pedraza had knowledge of the events but did not want to be involved.

[19] At one point during the interview, Pedraza said: "Just charge me and let me talk to my lawyer before I get myself or somebody else in some bulls***." Tr. Vol. II p. 55. Investigator Mullins exited the interview room; conferred with other officers regarding whether Pedraza requested counsel; returned to the interview room; and asked whether Pedraza desired counsel. Pedraza replied that he did not, and Investigator Mullins proceeded with the interview.

[20] On October 26, 2018, Pedraza moved to suppress his statement to police and, on November 19, 2018, the trial court conducted a hearing wherein Pedraza argued: (1) he did not knowingly, voluntarily, and intelligently waive his Fifth and Sixth Amendment rights; (2) the police denied Pedraza information about

---

[5] State's Exhibit 129 is a redacted DVD of Pedraza's videotaped interview with police.

their reasons for questioning him and the charges against him; and (3) the police continued to interview Pedraza after he invoked his right to counsel.

[21] The trial court denied Pedraza's motion to suppress on December 10, 2018, and found: (1) Pedraza's waiver of his rights was voluntary; (2) officers provided Pedraza with sufficient information about why they arrested Pedraza and brought Pedraza in for questioning; and (3) Pedraza did not make an unequivocal request for counsel. Appellant's App. Vol. II p. 114.

[22] At Pedraza's trial, Investigator Mullins testified that: at the time of the interview, Investigator Mullins knew that the State had already filed charges against Pedraza; and that, although Pedraza repeatedly asked to be advised of the charges against him, Investigator Mullins did not oblige because "[Pedraza] had an idea as to why [investigators] were questioning him." Tr. Vol. V p. 48. On cross-examination, defense counsel asked Investigator Mullins about the importance of "[b]eing totally aware of what is going on before [one] can intelligently and knowingly waive [Fifth and Sixth Amendment] rights." *Id.* at 48. The State objected that the question "call[ed] for a legal conclusion, one that the Court ha[d] already decided . . . ." *Id.*

[23] During Investigator Mullins' testimony, the State moved to introduce a redacted version of Pedraza's statement. The redacted statement omitted alleged Indiana Evidence Rule 404(B) evidence; Pedraza's alleged request for counsel; and Pedraza's remarks after his alleged request for counsel. Pedraza objected to the redacted statement and argued that the State placed him in a

Hobson's Choice scenario in which Pedraza could either: ask the trial court to admit, in its entirety, the statement that Pedraza initially sought to suppress; or waive his right against self-incrimination to clarify misleading impressions caused by the introduction of the incomplete statement. The State countered that Pedraza could not simultaneously oppose the introduction of the statement *and* object to a redacted version of the statement that excluded the objectionable remarks.

[24] The trial court: (1) found that Pedraza's statement was voluntary; (2) deemed the redacted statement to be admissible; (3) advised that defense counsel could elect to introduce the entire statement; and (4) admitted the redacted statement, after defense counsel declined to introduce the entire statement and lodged a continuing objection alleging violation of Pedraza's right to a fair trial.

### A. Knowing and Informed Miranda Waiver

[25] First, Pedraza argues that the trial court erred in admitting his statement because the police "intentionally withh[e]ld [charging] information and lie[d]" to him, denying him information necessary to make an informed *Miranda* waiver. Pedraza's Br. p. 17. The Fifth Amendment, incorporated to the States via the Fourteenth Amendment, guarantees that "no person . . . shall be compelled in any criminal case to be a witness against himself." U.S. Const. amend. V; *Kelly v. State*, 997 N.E.2d 1045, 1053 (Ind. 2013). The United States Supreme Court held in *Miranda v. Arizona*, 384 U.S. 436, 444, 86 S. Ct. 1602 (1966), that, before a law enforcement officer may subject someone to custodial interrogation, the officer must advise him "that he has a right to remain silent,

that any statement he does make may be used as evidence against him, and that he has a right to the presence of an attorney, either retained or appointed." *Kelly*, 997 N.E.2d at 1053. "If the officer does not so advise the subject, the prosecutor cannot use any statements the subject does make against him in court." *Id.* "The trigger to require the announcement of *Miranda* rights is custodial interrogation." *State v. Brown*, 70 N.E.3d 331, 335 (Ind. 2017).

[26] "[T]he relinquishment of the [*Miranda*] right must [ ] be[ ] voluntary in the sense that it was the product of a free and deliberate choice rather than intimidation, coercion or deception. Second, the waiver must have been made with a full awareness both of the nature of the right being abandoned and the consequences of the decision to abandon it." *Moran v. Burbine*, 475 U.S. 412, 106 S. Ct. 1135, 1141-42 (1986).

[27] In support of his argument, Pedraza relies on *Armour v. State*, 479 N.E.2d 1296 (Ind. 1985). Although *Armour* is distinguishable from the instant facts,[6] it is still instructive. After Armour's infant child suffered a brain injury, police asked to speak with Armour, who agreed. The police read Armour his *Miranda* advisements, and Armour signed a waiver and gave a statement to the police. On appeal, Armour argued that his statement, which included a confession, was not voluntarily made because he "believed that he was merely denying

---

[6] Armour waived *Miranda* in the interrogation phase and before any charges were filed against him.

battery charges and was unaware of potential neglect charges." *Armour*, 479 N.E.2d at 1298.

[28]     In finding a valid *Miranda* waiver; no deception, threat, or coercion; and that Armour "knew the reason for the investigation before" he made the incriminating statements, our Supreme Court reasoned:

> While *Miranda* indicated that the police should not threaten, trick, or cajole an accused into making a statement, *Miranda* does not require that an accused be specifically informed by the interrogator of the precise nature of the potential charges for which the accused is being questioned. More recently, the Supreme Court has indicated that the police need not inform a suspect prior to questioning what the precise nature of the charges may be. *Berkemer v. McCarty* (1984), 468 U.S. 420, 104 S. Ct. 3138 [ ]. In *Berkemer,* the Court refused to accord the *Miranda* procedural safeguards based upon a felony-misdemeanor distinction since the police are often unaware at the time of arrest whether the person committed a misdemeanor or a felony.
>
> \* \* \* \* \*
>
> Similarly, it would be unreasonable to require that police inform suspects prior to questioning at the investigatory stage as to the nature of all potential charges since there are innumerable unknown factors which may affect the resulting formal charge, if any. The impracticality of requiring police to state the precise nature of the charge to which an investigation may lead does not mean that the suspect is to be relegated to total ignorance of the subject matter of the interview or interrogation. *The suspect should be informed of the reason for the investigation or the incident which gave rise to the interrogation so that the suspect can make a knowing and intelligent decision whether to forgo the privilege against self-incrimination.* However, a knowing and intelligent decision to

waive *Miranda* rights does not require that the police provide the suspect with that quantum of knowledge which an attorney would require before rendering legal advice.

*Armour*, 479 N.E.2d at 1298 (emphasis added) (some citations omitted).

[29] Here, Investigator Mullins was aware of the precise charges that the State had already filed against Pedraza when the interview occurred. Although this distinction could prove material under different circumstances, it is immaterial here. The record reveals that, before Pedraza waived his *Miranda* rights, he asked why he was being interviewed, and Investigator Mullins replied: "It's got everything to do with Frederickson [Street]"; and "[w]e've got information that you were out there that night . . . ." *See* Tr. Exhibits Vol. p. 177, State's Ex. 129. In response, Pedraza volunteered that his childhood friend, Bethel, died in the Frederickson Street incident.

[30] Pedraza, thus, evinced his knowledge that the police were investigating at least one homicide. We are not persuaded by Pedraza's contention, under these circumstances, that he lacked "full awareness both of the nature of the right being abandoned and the consequences of the decision to abandon it" when he agreed to give a statement to homicide investigators. *See Moran,* 475 U.S. at 1141-42. Pedraza's claims of police deception are not credible. The trial court did not abuse its discretion in finding a voluntary *Miranda* waiver.

### B. *Miranda* Right to Counsel

[31]     Next, Pedraza argues that the trial court erred in admitting his statement because the police continued to interrogate Pedraza after he requested counsel.

> As established in *Miranda v. Arizona*, prior to any questioning of a person taken into custody, "the person must be warned that he has a right to remain silent, that any statement he does make may be used as evidence against him, and that he has a right to the presence of an attorney, either retained or appointed." If the accused requests counsel, "the interrogation must cease until an attorney is present." An accused's request for counsel, however, must be unambiguous and unequivocal. The cessation of police questioning is not required "if a suspect makes a reference to an attorney that is ambiguous or equivocal in that a reasonable officer in light of the circumstances would have understood only that the suspect might be invoking the right to counsel." Indeed, "[i]nvocation of the *Miranda* right to counsel requires, at a minimum, some statement that can reasonably be construed to be an expression of a desire for the assistance of an attorney." The request must be made with sufficient clarity such that a "reasonable police officer under the circumstances would understand the statement as a request for an attorney."

*Anderson v. State*, 961 N.E.2d 19, 26-28 (Ind. Ct. App. 2012) (citations and footnote omitted).

[32]     A defendant's statement is either "an assertion of the right to counsel or it is not." *Schuler v. State*, 112 N.E.3d 180, 188 (Ind. 2018) (quoting *Davis v. United States*, 512 U.S. 452, 459, 114 S. Ct. 2350, 2355 (1994)). Schuler argued that his *Miranda* rights were violated when the police failed to stop questioning him after he requested counsel during a custodial interrogation. Finding no *Miranda*

violation from the continuation of questioning after Schuler said: "I want my attorney, but I'll answer, you can ask me questions[,]" our Supreme Court opined:

> Police investigators are not required to stop questioning "if a suspect makes a reference to an attorney that is ambiguous or equivocal in that a reasonable officer in light of the circumstances would have understood only that the suspect *might* be invoking the right to counsel." *Davis* [ ], 512 U.S. [at] 459, 114 S. Ct. [at] 2355 [ ]. If a defendant's statements are unclear, police may ask clarifying questions to determine whether the accused has actually requested counsel.
>
> * * * * *
>
> *See also Sleek v. State*, 499 N.E.2d 751, 754 (Ind. 1986) ("Even if [an accused's] request was perceived to be inherently ambiguous, or equivocal in light of the preceding events, any further questioning should have been narrowly limited to clarifying whether [the accused] actually wished to have counsel present.").

*Schuler,* 112 N.E.3d at 187 (some citations omitted) (emphasis in original).

[33] Our Supreme Court concluded that: (1) "[a] reasonable officer in light of the circumstances would have found Schuler's statement to be ambiguous"; (2) Schuler gave the police "permission to continue questioning [him]"; (3) the detective "acted as any reasonable police officer would" by asking whether Schuler wanted counsel, which Schuler denied; and (4) "Schuler's statements [ ] show[ed] that he was aware of his right to an attorney but chose to speak with the detective anyway." *Id.*

[34] Here, as in *Schuler*, a reasonable officer would have deemed Pedraza's remark— "Just charge me and let me talk to my lawyer before I get myself or somebody else in some bulls***"— to be ambiguous. *See* Tr. Vol. II p. 55. The record reflects that Investigator Mullins immediately suspended the interview, left the room to consult with colleagues, and—on his return—asked outright whether Pedraza intended to invoke his right to counsel. Pedraza replied that he did not. Pedraza was, thus, aware of his right to consult with counsel, but declined to unequivocally assert it. Based on the foregoing, the trial court properly concluded that the continued interrogation did not violate Pedraza's *Miranda* right to counsel. The trial court did not abuse its discretion in admitting Pedraza's redacted statement.[7]

### C. Cross-Examination of Investigator Mullins

[35] Pedraza maintains that the trial court erred in limiting his cross-examination of Investigator Mullins "regarding the voluntariness of Pedraza's purported waiver of his *Miranda* rights." Pedraza's Br. p. 28. During Pedraza's cross-examination of Investigator Mullins, defense counsel asked about the importance of "[b]eing totally aware of what is going on before [the defendant] can intelligently and knowingly waive those rights." Tr. Vol. V. pp. 48-49. The

---

[7] The State redacted Pedraza's statement to include only Pedraza's remarks that preceded the equivocal request for counsel.

State objected to the question as calling for a legal conclusion on a matter that the trial court already decided. The trial court sustained the State's objection.

[36] When a trial court limits cross-examination in violation of a defendant's right of cross-examination, a "conviction will be sustained only if the error is harmless beyond a reasonable doubt." *McCorker v. State*, 797 N.E.2d 257, 266 (Ind. 2003); *McCarthy v. State*, 749 N.E.2d 528, 534 (Ind. 2001).

[37] "The Due Process Clause of the Fourteenth Amendment to the United States Constitution guarantees criminal defendants the right to a fair trial, and the basic elements of a fair trial are defined largely through provisions of the Sixth Amendment."[8] *Leonard v. State*, 73 N.E.3d 155, 168 (Ind. 2017) (quoting *Huffman v. State*, 543 N.E.2d 360, 375 (Ind. 1989), *overruled in part on other grounds*, *Street v. State*, 567 N.E.2d 102 (Ind. 1991)) (citations omitted). "Among a defendant's Sixth Amendment rights is the right of confrontation that secures the defendant's opportunity to conduct cross-examination." *Id*.

[38] Our Supreme Court has reasoned:

> [T]he trial court must make a preliminary factual determination of voluntariness when assessing the statement's admissibility. The jury, however, remains the final arbiter of all factual issues under Article 1, Section 19 of the Indiana Constitution. Even if the court preliminarily determines that the statement is voluntary and admits it for the jury's consideration, then the defendant is

---

[8] The Sixth Amendment to the United States Constitution provides, in part, that "[i]n all criminal prosecutions, the accused shall enjoy the right . . . to be confronted with the witnesses against him[.]"

still entitled to dispute the voluntariness of the statement once it is presented to the jury. Although the court has previously determined voluntariness in connection with the statement's admissibility, the jury may find that the statement was involuntarily given.

*Miller v. State*, 770 N.E.2d 763, 772 (Ind. 2002). Based on *Miller*, we find that the trial court erred in limiting Pedraza's cross-examination regarding the voluntariness of the statement. *See id.* ("[A] trial court's determination that a defendant's statement was voluntary and admissible does not preclude the defense from challenging its weight and credibility.").

[39] Ultimately, however, the error is harmless, given the strength of the State's case, which included surveillance footage placing Pedraza at the scene, despite his claim that he was out of town when the murders were committed; testimony of Gavin and Snyder; cell phone records; and other corroborating evidence. *See Bailey v. State*, 131 N.E.3d 665, 683 (Ind. Ct. App. 2019) (holding that exclusion of wrongfully excluded evidence is harmless error where there is overwhelming evidence of defendant's guilt).

### E. Redaction of Statement

[40] Pedraza argues that, by permitting the State to introduce only a portion of Pedraza's statement, the trial court created a Hobson's Choice scenario wherein Pedraza "[wa]s forced to" either "waive his Sixth Amendment argument that he raised in his motion to suppress by introducing the remaining portion of his statement, or [ ] waive his Fifth Amendment right not to testify and take the stand." Pedraza's Reply Br. p. 6.

[41] Indiana Evidence Rule 106 provides: "If a party introduces all or part of a writing or recorded statement, an adverse party may require the introduction, at that time, of any other part—or any other writing or recorded statement—that in fairness ought to be considered at the same time."

[42] Pedraza cites *U.S. v. Walker*, 652 F.2d 708 (7th Cir. 1981), in support of his argument. In *Walker*, the Government moved—in Walker's second trial—to introduce select portions of Walker's testimony from the first trial, which ended in a mistrial. When Walker sought to admit his trial testimony in its entirety, the trial court refused. After Walker was convicted, he argued, on appeal, that the district court's evidentiary ruling violated Federal Evidence Rule 106. *Walker*, 652 F.2d at 710.

[43] On appeal, the Seventh Circuit found that "substantial portions" of the excluded testimony "were both relevant to specific elements of the Government's proof and explanatory of the excerpts already admitted" and "qualif[ied] for admission under [Rule] 106[.]" *Id*. at 711, 713. Further, the Seventh Circuit concluded that the Government's selective presentation of Walker's prior testimony "resulted in the total exclusion of Walker's testimony explaining the parts admitted" and "penalize[d] Walker for failing to testify at his second trial[.]" *Id*. at 714. Having found error, the Seventh Circuit declined to deem the error harmless and reversed Walker's conviction because the evidence against Walker was "close and often conflicting[.]" *Id*. at 715.

[44] Pedraza's reliance on *Walker* is misplaced here. Unlike the circumstances in *Walker*, the trial court here did not foreclose Pedraza's opportunity to introduce his statement in its entirety. As the trial court stated to defense counsel: ". . . [T]he choice is yours"; and "[t]he State has the right to put in a portion of the statement. [The Defense] ha[s] a right to ask that . . . more of [the statement] be put in pursuant to Rule 106[.]" Tr. Vol. V. p. 20.

[45] *Walker* does not stand for the proposition that a defendant who elects not to testify, and who also rejects the remedial effect of Rule 106 to clarify potentially misleading impressions caused by the incomplete presentation, has suffered a violation of his constitutional rights. To the contrary, a defendant who elects not to testify can avail himself of Rule 106 to address misleading impressions created by the incomplete presentation of evidence.[9] Presented with the opportunity to introduce his entire statement, Pedraza declined.

[46] Moreover, unlike *Walker*, in which the evidence was close and conflicting, the State presented considerable evidence of Pedraza's involvement in the crime

---

[9] In *Walker*, the Seventh Circuit reasoned:

> In criminal cases where the defendant elects not to testify, as in the present case, more is at stake than the order of proof. If the Government is not required to submit all relevant portions of prior testimony which further explain selected parts which the Government has offered, the excluded portions may never be admitted. Thus there may be no "repair work" which could remedy the unfairness of a selective presentation later in the trial of such a case. While certainly not as egregious, the situation at hand does bear similarity to "(f)orcing the defendant to take the stand in order to introduce the omitted exculpatory portions of (a) confession (which) is a denial of his right against self-incrimination."

*Walker*, 652 F.2d at 713 (citations omitted).

including surveillance footage placing Pedraza at the scene, despite Pedraza's claim that he was out of town when the murders were committed; surveillance footage that, consistently with Gavin's testimony, depicted Pedraza entering Snyder's garage and exiting moments before Bethel ran in with a gun; Gavin's additional testimony that Pedraza orchestrated the robbery; cell phone tower data placing Pedraza's phone in the vicinity of Frederickson Street at the time of the murders; and other corroborating evidence. *See Bailey*, 131 N.E.3d at 683 (Where there is overwhelming evidence of defendant's guilt, exclusion of wrongfully excluded evidence is harmless error.). For the foregoing reasons, the trial court did not deny Pedraza a fair trial or abuse its discretion when it admitted Pedraza's redacted statement.

## *II. Excluded Exhibits*

[47] Next, Pedraza argues that the trial court abused its discretion by excluding, as hearsay and needlessly cumulative, Pedraza's proffered defense exhibits B and C—excerpts of Gavin's videotaped statement to police—that were purportedly relevant to judging Gavin's credibility.[10]

[48] The record reveals that, at trial, the State called Gavin to testify. Gavin testified to the facts regarding the drug-deal-turned-robbery; he also testified that: (1) en

---

[10] Specifically, Pedraza argues that the trial court erred in refusing to admit excerpted portions of Gavin's police interviews in which: (1) "the elected prosecutor of St. Joseph County, Ken Cotter[,] ultimately promis[ed] not to charge Gavin with anything related to the killings and shooting at [ ] Frederickson Street [ ] . . . as long as Gavin would 'cooperate'"; and (2) "an ATF Agent t[old] Gavin that [the agent] knows Gavin is aware of the process, and that the 'first horse to the trough gets the best drink.'" Pedraza's Br. p. 24.

route to Snyder's house, Pedraza and Bethel "actually swapp[ed] guns with each other"; (2) neither Benito nor Pedraza had "enough [money] to cover the whole quantity for the pound and a half [of methamphetamine,]" tr. vol. IV p. 148; (3) Gavin initially lied to police investigators regarding his involvement in the shooting; (4) the elected prosecutor agreed to forgo charging Gavin with offenses in State court; (5) Gavin received another favorable plea agreement from the State in an unrelated matter in which Gavin cooperated with the State; and (6) the federal government dismissed two criminal counts against Gavin during his period of cooperation with state and federal officials. On cross-examination, defense counsel asked Gavin whether the favorable charging treatment and plea agreements induced Gavin to give false testimony.

[49] We will not reverse a conviction for an error that does not affect the substantial rights of the defendant. *Pierce v. State*, 29 N.E.3d 1258, 1268 (Ind. 2015). Where the wrongfully excluded evidence is merely cumulative of other evidence presented, its exclusion is harmless error. *Id*.

[50] Assuming—without deciding—that the trial court improperly excluded Pedraza's proffered exhibits, we find that any error was harmless. The State argues, and we agree, that "the issue of Gavin's credibility was squarely before the jury, and [ ] any additional evidence in that regard was cumulative." State's Br. p. 22. Here, Gavin testified before the jury that, during the relevant period: (1) Gavin initially lied to police investigators; (2) the prosecutor agreed to forgo charging Gavin with offenses in State court; (3) Gavin received another

favorable plea agreement in an unrelated matter; and (4) the federal government dismissed pending charges against Gavin.

[51] The exclusion of Pedraza's proffered exhibits was harmless in light of: (1) Gavin's cumulative testimony; (2) Pedraza's opportunity to cross-examine Gavin at length; and (3) the overall strength of the State's case, which included surveillance footage placing Pedraza at the scene, despite Pedraza's claim that he was out of town when the murders were committed; surveillance footage that, consistently with Gavin's testimony, depicted Pedraza entering Snyder's garage and exiting moments before Bethel ran in with a gun; Gavin's additional testimony that Pedraza orchestrated the robbery; cell phone tower data placing Pedraza's phone near Frederickson Street at the time of the murders; and other corroborating evidence. Error, if any, from the exclusion of defense exhibits B and C was harmless. *See Pierce,* 29 N.E.3d at 1268; *see Bailey*, 131 N.E.3d at 683 (If there is overwhelming evidence of defendant's guilt, exclusion of wrongfully excluded evidence is harmless error.).

### III. NIST Study

[52] Pedraza argues that he was denied his right to a fair trial when the trial court limited his cross-examination of Daun Powers, forensic pathologist of the DNA serology unit of the Indiana State Police Laboratory. During the jury trial, Powers testified that she examined evidence for potential sources of DNA; analyzed the handgun that was recovered near Bethel's body; and discovered a multi-source DNA profile on the gun magazine. Powers testified further that, in analyzing the DNA, she found: (1) very strong support that Pedraza

contributed to the DNA profile recovered from the handgun; and (2) that it was 330 million times more likely that the DNA profile recovered from the handgun originated from Pedraza, Bethel, and another person.

[53] On cross-examination of Powers, defense counsel asked Powers about a National Institute of Standards and Technology ("NIST") scientific research study in which researchers found that, when laboratories conduct DNA mixture analysis—forensic analysis of evidence that contains a mixture of DNA from different people—the results can vary significantly across laboratories. *Id*. at 117; tr. vol. V p. 136. Defense counsel moved to introduce the study into evidence. The State objected on hearsay grounds and argued that Pedraza was "trying to offer the study and its conclusion as evidence in the form of a question." Tr. Vol. IV p. 104. The trial court sustained the State's objection and found that defense counsel sought "to go into the study in [ ] great [ ] detail" without laying a sufficient foundation. *Id*. at 115. Powers testified that: (1) she was aware of, but lacked specific knowledge of, the study; and (2) she knew only that the researchers concluded "that interpretation varies" when laboratories conduct DNA mixture analysis. *Id*. at 117.

[54] On appeal, Pedraza argues that, given the significance of Powers' testimony that Pedraza's DNA was found on a handgun that was collected from the crime scene, it was error for the trial court to "prevent[ ] Pedraza from confronting Powers with the [ ] NIST study," when "Powers was aware of the study [ ] and [ ] NIST was a respected authority in [Power's] field." Pedraza's Br. p. 28.

[55] In general, excerpts from a journal or treatise offered to discredit an expert's testimony meet the definition of hearsay, which is an out-of-court statement "offered in evidence to prove the truth of the matter asserted." Ind. Evidence Rule 801. Hearsay evidence is not admissible unless it meets one of the exceptions set by statute or rule. Evid. R. 802. One of the exceptions applies to treatises and periodicals, stating as follows:

> A statement contained in a treatise, periodical, or pamphlet [is not excluded by the rule against hearsay] if:
>
> > (A) the statement is called to the attention of an expert witness on cross-examination or relied on by the expert on direct examination;
> >
> > (B) the statement contradicts the expert's testimony on a subject of history, medicine, or other science or art; and
> >
> > (C) the publication is established as a reliable authority by the expert's admission or testimony, by another expert's testimony, or by judicial notice.
>
> If admitted, the statement may be read into evidence but not received as an exhibit.

Ind. Evidence Rule 803(18).

[56] The record reveals that defense counsel called the NIST study to Powers' attention on cross-examination, *see* Evid. R. 803(18)(A); and identified the NIST study as being propounded by the National Institute of Standards and Technology, of which Powers was aware, *see* Evid. R. 803(18)(C). Even

assuming that Pedraza's broad challenge to the reliability of DNA mixture analysis, as employed by Powers, constitutes a "contradict[ion]" under Rule 803(18)(B), we find that the trial court's exclusion of the NIST study constitutes harmless error, given the overwhelming evidence of Pedraza's guilt. *See Turner*, 953 N.E.2d at 1058 (holding improper exclusion of evidence is harmless if the conviction is supported by substantial independent evidence of guilt that satisfies the reviewing court that there is no substantial likelihood that the challenged evidence contributed to the conviction).

# Conclusion

[57] The trial court did not err when it found Pedraza's statement to police was voluntary and that he waived his right to counsel, and the trial court did not abuse its discretion in admitting Pedraza's redacted statement. Any error from: (1) the limitation of Investigator Mullins' cross-examination; (2) the exclusion of Pedraza's proffered exhibits; and (3) the exclusion of the NIST study was harmless. We affirm.

[58] Affirmed.

Najam, J., and Vaidik, J., concur.